244 P.3d 1 (2010)
SCHOOL DISTRICTS' ALLIANCE FOR ADEQUATE FUNDING OF SPECIAL EDUCATION, consisting of Bellingham School District No. 501, a municipal corporation; Bethel School District No. 403; Burlington-Edison School District No. 100, a municipal corporation; Everett School District No. 2, a municipal corporation; Federal Way School District No. 210, a municipal corporation; Issaquah School District No. 411, a municipal corporation; Lake Washington School District No. 414, a municipal corporation; Mercer Island School District No. 400, a municipal corporation; Northshore School District No. 417, a municipal corporation; Puyallup School District No. 3, a municipal corporation; Riverside School District No. 416, a municipal corporation; and Spokane School District No. 81, a municipal corporation, Petitioners,
v.
The STATE of Washington; Gary Locke, in his capacity as Governor of the State of Washington; Terry Bergeson, in her capacity as Superintendent of Public Instruction; Brad Owen, in his capacity as President of the Senate and principal legislative authority of the State of Washington; Frank Chopp, in his capacity as Speaker of the House of Representatives and principal legislative authority of the State of Washington, Respondents.
No. 82961-6.
Supreme Court of Washington, En Banc.
Argued June 22, 2010.
Decided December 9, 2010.
*2 John Craig Bjorkman, Christopher Lee Hirst, Grace Tsuang Yuan, Gregory J. Wong, K & L Gates, L.L.P., Seattle, WA, for Petitioners.
William Gerard Clark, Newell David Smith, Office of the Attorney General, Seattle, WA, David Alan Stolier, Office of the Attorney General, Olympia, WA, for Respondents.
Susan Kay Schreurs, Tacoma, WA, amicus counsel for Bellingham School District No. 501, Bethel School District No. 403, Burlington-Edison School District No. 100, Everett School District No. 2, Federal Way School District No. 210, Issaquah School District No. 411, Lake Washington School District No. 414, Mercer Island School District No. 400, Northshore School District No. 417, Puyallup School District No. 3, Riverside School District No. 416 and Spokane School District No. 81.
OWENS, J.
¶ 1 This case concerns a challenge to the special education funding mechanism in Washington State. The School Districts' Alliance for Adequate Funding of Special Education (Alliance) argues that the Court of Appeals erred when it held that the State's procedures for funding special education do not violate the Washington Constitution. The Alliance argues that the Court of Appeals (1) used the wrong standard and (2) improperly included the Basic Education Allotment (BEA) in its analysis when it determined whether special education is adequately funded. We affirm the Court of Appeals and hold that when the proper standard is applied, the existing funding mechanism for special education does not violate the Washington Constitution.

*3 FACTS
¶ 2 The Washington Constitution provides that "[i]t is the paramount duty of the state to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex." CONST. art. IX, § 1. We have held that the State's paramount duty is to make ample provision for basic education through "dependable and regular tax source[s]." Seattle Sch. Dist. No. 1 v. State, 90 Wash.2d 476, 526, 585 P.2d 71 (1978). Special excess levies cannot be used to pay for basic education, though they can be used for "`enrichment program[s].'" Id.
¶ 3 Special education is designed to ensure that all children with disabilities receive an appropriate education at public expense. RCW 28A.155.010. Special education in Washington is funded through three mechanisms. The first is the BEA, which the State provides to districts based on the average annual full-time equivalent enrollment of all students, both special education students and other students, in the district. RCW 28A.150.250; LAWS OF 2005, ch. 518, § 502(2). It is undisputed that "special education students are entitled to the full [BEA]." LAWS OF 2005, ch. 518, § 507(2)(a)(ii). Basic education, as defined by the legislature, is considered fully funded by the BEA. RCW 28A.150.250.
¶ 4 In addition, special education students receive excess funding from the State, "[t]o the extent a school district cannot provide an appropriate education for special education students ... through the general apportionment allocation." LAWS OF 2005, ch. 518, § 507(1). This excess special education funding is provided "on an excess cost basis" and is equal to a "district's annual average full-time equivalent basic education enrollment multiplied by the funded enrollment percent... multiplied by the district's average basic education allocation per full-time equivalent student multiplied by 0.9309." LAWS OF 2005, ch. 518, § 507(1), (5)(a)(ii). Essentially, the State provides each school district with additional special education funding that is 0.9309 times the BEA for each special education student.
¶ 5 The third means by which the State funds special education is through the "safety net," which awards additional monies to "districts with demonstrated needs for special education funding beyond the amounts provided" by the BEA and the excess special education funding. Laws of 2005, ch. 518, § 507(8). Presently, state safety net funds are available for students whose excess cost of special education services exceeds approximately $15,000, and federal safety net funds are also available for excess costs above approximately $21,000. When awarding safety net funding, the State considers "unmet needs for districts that can convincingly demonstrate that all legitimate expenditures for special education exceed all available revenues from state funding formulas." Laws of 2005, ch. 518, § 507(8)(a). Safety net awards cannot be based on "program costs attributable to district philosophy, service delivery choice, or accounting practices." Id.
¶ 6 The Alliance filed suit alleging that the State was not fully funding special education, forcing school districts to unconstitutionally use special excess levies to attain adequate funding. The Alliance presented evidence of underfunding from F-196 reports (annual financial documents that school districts submit to the State that list education revenues by source and accounting for expenditures by program) and Worksheet A (an application for safety net funding demonstrating financial need for additional safety net funding). In presenting this evidence, the Alliance omitted the funding that came from the BEA, arguing that school districts expend the entire BEA for special education students in the basic education classrooms. The trial court found that the Alliance had not proved that the State's special education funding formula was unconstitutional beyond a reasonable doubt. Specifically, the trial court ruled that a district must expend all of the BEA and all of the excess special education funding before it can contend that the legislature has underfunded special education. The Alliance appealed to the Court of Appeals, arguing, among other claims, that the trial court erred by (1) including the BEA as part of the total special education funding, (2) requiring the Alliance to prove that the funding mechanism was unconstitutional *4 beyond a reasonable doubt, and (3) finding that the additional 0.9309 multiplier was rational. The Court of Appeals affirmed, holding that the Alliance had not met its burden to prove beyond a reasonable doubt that the special education funding mechanism violated the Washington Constitution. Sch. Dists.' Alliance for Adequate Funding of Special Educ. v. State, 149 Wash. App. 241, 266, 202 P.3d 990 (2009). The Alliance petitioned for review, which we granted. Sch. Dists.' Alliance for Adequate Funding of Special Educ. v. State, 166 Wash.2d 1024, 217 P.3d 337 (2009).

ISSUES
¶ 7 1. What is the correct standard for determining whether the State's special education mechanism violates the Washington Constitution?
¶ 8 2. Should the BEA be included when we determine if Washington adequately funds special education?
¶ 9 3. Does article VIII, section 4 of the Washington Constitution preclude applying the BEA to special education?

ANALYSIS

I. The Proper Standard Is "Beyond a Reasonable Doubt"
¶ 10 The Alliance argues that the Court of Appeals used the incorrect standard when it determined that the Alliance must prove the special education mechanism unconstitutional "beyond a reasonable doubt." Sch. Dists.' Alliance, 149 Wash.App. at 266, 202 P.3d 990. The Alliance asserts that since the State's paramount duty is to make ample provision for the education of children, a lower standard should apply to the petitioners. We disagree and affirm the long standing rule that a party challenging a statute's constitutionality must prove it unconstitutional "beyond a reasonable doubt."
¶ 11 In Washington, it is well established that statutes are presumed constitutional and that a statute's challenger has a heavy burden to overcome that presumption; the challenger must prove that the statute is unconstitutional beyond a reasonable doubt. Wash. Fed'n of State Employees v. State, 127 Wash.2d 544, 558, 901 P.2d 1028 (1995). This standard, that we will not declare a statute unconstitutional "unless its conflict with the constitution is plain beyond a reasonable doubt," stretches all the way back to our holding in Parrott & Co. v. Benson, 114 Wash. 117, 122, 194 P. 986 (1921). This standard has appeared throughout our jurisprudence. See State v. Maciolek, 101 Wash.2d 259, 263, 676 P.2d 996 (1984); see also State v. Aver, 109 Wash.2d 303, 306-07, 745 P.2d 479 (1987). We discussed the reasoning behind the standard in Island County v. State, 135 Wash.2d 141, 147, 955 P.2d 377 (1998):
[T]he "beyond a reasonable doubt" standard used when a statute is challenged as unconstitutional refers to the fact that one challenging a statute must, by argument and research, convince the court that there is no reasonable doubt that the statute violates the constitution. The reason for this high standard is based on our respect for the legislative branch of government as a co-equal branch of government, which, like the court, is sworn to uphold the constitution.... Additionally, the Legislature speaks for the people and we are hesitant to strike a duly enacted statute unless fully convinced, after a searching legal analysis, that the statute violates the constitution.
¶ 12 We later reaffirmed our understanding that a demanding standard is justified because "we assume the Legislature considered the constitutionality of its enactments and afford great deference to its judgment." Tunstall v. Bergeson, 141 Wash.2d 201, 220, 5 P.3d 691 (2000). We have also used the "beyond a reasonable doubt" standard in the context of challenges to article IX, section 1. In Tunstall, we used the "beyond a reasonable doubt" standard in determining that the legislature had not violated article IX, section 1 by enacting a statute that provided for education for children incarcerated in adult prisons. Id. at 220-23, 5 P.3d 691. In Brown v. State, 155 Wash.2d 254, 266, 119 P.3d 341 (2005), we again used the "beyond a reasonable doubt" standard in determining that the State had not violated article IX, *5 section 1 when it reduced the number of days of education that it was willing to fund.
¶ 13 We note that when we say "beyond a reasonable doubt," we do not refer to an evidentiary standard. "Beyond a reasonable doubt" in this context merely means that based on our respect for the legislature, we will not strike a duly enacted statute unless we are "fully convinced, after a searching legal analysis, that the statute violates the constitution."[1]Island County, 135 Wash.2d at 147, 955 P.2d 377.
¶ 14 The Alliance argues that the correct standard is "preponderance of the evidence" for as-applied challenges. The Alliance bases this argument on our statement in Seattle School District that "[t]hus, contrary to appellants' contention, the normal civil burden of proof, i.e., `preponderance of the evidence', applies." 90 Wash.2d at 528, 585 P.2d 71. A reading of that case shows, however, that we were referring to the appropriate evidentiary standard for factual issues when we made this statement. We noted that the State was challenging the sufficiency of the evidence "to support the trial court's findings of fact and conclusions of law pertaining to the reasonableness of the District's salary scale, staffing ratios, associated nonsalaried costs and consequently the failure of the State to adequately fund those reasonable costs" before discussing which standard to use. Id. at 527, 585 P.2d 71. The State was not challenging the validity of a statute. When we made that statement, we were not discussing the standard for declaring a statute unconstitutional, but instead whether the existing evidence was sufficient for a trial court to make its findings of fact and conclusions of law. We stated that we would not use the "highest burden of proof" standard from the inapposite case of In re Salary of Juvenile Director, 87 Wash.2d 232, 552 P.2d 163 (1976). Seattle Sch. Dist., 90 Wash.2d at 528, 585 P.2d 71. Instead, we merely confirmed the general rule that "preponderance of the evidence" is the standard for review of a court's factual findings. Id.
¶ 15 There is nothing in the Seattle School District case that mandates a change in the general standard for declaring a statute unconstitutional. In fact, the Seattle School District case did not involve a challenge to any existing statute, but instead focused on the fact that the legislature had not expressly determined what level of education funding would be sufficient to provide basic education and comply with its constitutional mandate. Id. at 519, 537, 585 P.2d 71. We even noted that "[w]hile the Legislature must act pursuant to the constitutional mandate to discharge its duty, the general authority to select the means of discharging that duty should be left to the Legislature." Id. at 520, 585 P.2d 71. In short, there is no basis for the Alliance's conclusion that we should apply a "preponderance of the evidence" standard when we review a claim that a statute violates article IX, section 1. We reaffirm the general rule laid down in Tunstall and Brown that the legislature is entitled to great deference and that a party challenging a statute's constitutionality must therefore prove the statute unconstitutional beyond a reasonable doubt.
¶ 16 The Alliance also argues (1) that the Court of Appeals improperly applied equal protection analysis and (2) that the burden should shift to the State to demonstrate that it met its paramount duty to fund education once the Alliance proved a prima facie case of underfunding. The Court of Appeals in no way applied equal protection analysis. Furthermore, as discussed in sections II and III, the Alliance did not prove a prima facie case *6 of underfunding. Even if the Alliance did present a prima facie case of underfunding, the Alliance presents no authority suggesting that the burden should then shift to the State to prove that the State did not underfund special education. These arguments are without merit.

II. When the BEA Is Included, the Special Education Funding Mechanism Does Not Violate the Washington Constitution
¶ 17 The Alliance argues that the State does not adequately fund special education, claiming that local districts had to pay an unfunded deficit of $112 million of special education services with local money. The Alliance alleges that the districts in total had $147 million in collective demonstrated need but that only $35 million could be obtained from the safety net funding, leaving a deficit of $112 million. Sch. Dists.' Alliance, 149 Wash.App. at 254-55, 202 P.3d 990. This supposed deficit, however, does not include the BEA. The trial court determined that it had to consider BEA funding in addition to excess special education funding when deciding whether special education was adequately funded, noting that the Alliance "seeks in essence to decouple special education funding from BEA funding." Clerk's Papers at 306, 324-25. The trial court concluded that a district must expend its entire BEA and all of the excess special education funding allocation before it can make a claim that the legislature has underfunded special education.[2] The Court of Appeals affirmed, ruling that substantial evidence supported the trial court's finding that the Alliance could not properly exclude the BEA from its calculations. Sch. Dists.' Alliance, 149 Wash.App. at 259-60, 202 P.3d 990. The Court of Appeals held that when the BEA is properly included in the funding calculations, the Alliance had not proved underfunding of special education beyond a reasonable doubt. Id. at 256-60, 202 P.3d 990.
¶ 18 For us to conclude that the BEA should not be included in calculations of how much funding goes to special education, we would have to agree with the Alliance's contention that basic education and special education are in entirely separate realms. The Alliance attempts to differentiate between basic education and special education services, but the law does not support this distinction. The bill funding additional special education allocation states in relevant part:
(1) Funding for special education programs is provided on an excess cost basis.... School districts shall ensure that special education students as a class receive their full share of the general apportionment allocation accruing through sections 502 and 504 of this act. To the extent a school district cannot provide an appropriate education for special education students ... through the general apportionment allocation, it shall provide services through the special education excess cost allocation funded in this section.
(2)(a) ...
(i) Special education students are basic education students first;
(ii) As a class, special education students are entitled to the full basic education allocation; and
(iii) Special education students are basic education students for the entire school day.
LAWS OF 2005, ch. 518, § 507.
¶ 19 Washington law also provides that "[a]ny school district required to provide [special education] services shall thereupon be granted regular apportionment of state and county school funds and, in addition, allocations from state excess funds made available for such special services for such period of time as such special education program is given." RCW 28A.155.050 (emphasis added). "The superintendent of public *7 instruction, by rule, shall establish for the purpose of excess cost funding ... functional definitions of special education, the various types of disabling conditions, and eligibility criteria for special education programs for children with disabilities." RCW 28A.155.020 (emphasis added). The legislature has consistently made it clear that special education students are also basic education students and that the additional special education funding is in addition to, and takes into account, the BEA. We therefore disagree with the Alliance's contention that basic education and special education are entirely separate. We affirm the trial court and Court of Appeals and hold that the BEA must be included in the calculations when deciding if special education is adequately funded.
¶ 20 The Alliance also contends that even if the BEA is included in the calculations, special education is still underfunded. It alleges that basic education is "fully funded" by the BEA but not "more than fully funded," so there is nothing left over in the BEA to pay for special education services as well. There is nothing in the record to support this assertion.[3] The BEA need not be used only for the basic education of special education students; a district's BEA plus its excess cost special education allocation all go toward educating a special education child, education that includes both basic and special education. Even when a student is receiving special education, he or she is also receiving basic education. The two are utterly intertwined. We will not decouple basic and special education and say that the BEA is always used up solely on basic education. Such a result would be absurd. The Alliance's own expert found that a special education student costs 190 percent of a basic education student. The State, when including the BEA and additional special education funding, allocates 193.09 percent of the cost of a basic education student for each special education student. Any deficit in special education disappears when the BEA is included in the calculations. The Alliance therefore does not present a prima facie case that the State is underfunding special education and fails to prove beyond a reasonable doubt that the State violated article IX, section 1.

III. Article VIII, Section 4 of the Washington Constitution Does Not Preclude Applying the BEA to Special Education
¶ 21 The Alliance next argues that article VIII, section 4 precludes the legislature from applying the BEA to fund special education.[4] The Alliance asserts that the legislature is not allowed to appropriate basic education funds to pay for special education. Specifically, the Alliance argues that section 502 of chapter 518 of the Laws of 2005 provides funding only for basic education and that article VIII, section 4 precludes the State from appropriating any of the money in section 502 for special education. We disagree.
¶ 22 Article VIII, section 4 states that "[n]o moneys shall ever be paid out of the treasury ... except in pursuance of an appropriation by law ... and every such law making a new appropriation ... shall distinctly specify the sum appropriated, and the object to which it is to be applied, and it shall not be sufficient for such law to refer to any other law to fix such sum." We have stated that this constitutional provision "requires every appropriation to specify the sum it appropriates for expenditure and the object to which the appropriation is to be applied." Wash. Ass'n of Neighborhood Stores v. State, 149 Wash.2d 359, 366, 70 P.3d 920 (2003).
¶ 23 The laws funding education do not violate article VIII, section 4. First and foremost, the legislature provided at the beginning of chapter 518 that it was adopting a general budget and that the specified amount *8 could be "spent only for the specified purpose" if the legislature stated that it was "`[p]rovided solely.'" LAWS OF 2005, ch. 518, § 1(2)(e). Part V of chapter 518, including sections 502, 503, 504, and 507, provides funding for education. Section 502 provides funds for the general apportionment to the superintendent of public instruction. It sets out the number of certified instructional staff that the State will fund in each district based on the district's average enrollment. This section does not state that it was provided solely for basic education, nor does it state that its funds cannot be used to pay for part of the special education costs for special education students. It merely provides a state allotment to each district based on its average total enrollment of all students. LAWS OF 2005, ch. 518, § 502. Section 503 determines the salaries and benefits that will be paid to certified instructional and administrative staff from the allocation in section 502. LAWS OF 2005, ch. 518, § 503. It does not state that it was "provided solely" for basic education. Section 504 provides a cost of living adjustment and incremental fringe benefit allocations for teachers who are funded under sections 502 and 503. LAWS OF 2005, ch. 518, § 504. It also does not state that it was "provided solely" for basic education. Section 507 states:
(1) Funding for special education programs is provided on an excess cost basis, pursuant to RCW 28A.150.390. School districts shall ensure that special education students as a class receive their full share of the general apportionment allocation accruing through sections 502 and 504 of this act. To the extent a school district cannot provide an appropriate education for special education students under chapter 28A.155 RCW through the general apportionment allocation, it shall provide services through the special education excess cost allocation funded in this section.
LAWS OF 2005, ch. 518, § 507.
¶ 24 Section 507, which funds special education, specifically states that special education students are to receive their full share of general basic education funds under sections 502 and 504. Id. It also states that special education funding is on an excess basis, pursuant to RCW 28A.150.390. Id. RCW 28A.150.390 states that special education programs must take into account state funds accruing through RCW 28A.150.250 and RCW 28A.150.260, statutes that describe the BEA. In short, section 507 clearly states that special education funding is given to special education students in addition to their receipt of the BEA. Furthermore, section 502 in no way states that it is only for basic education and not for special education. Section 502 funds a base level of education for all students while section 507 provides excess funding for special education students. It bears repeating that for special education students, special education and basic education are inextricably linked. When special education students are receiving special education services, they are also receiving basic education. LAWS OF 2005, ch. 518, § 507(2)(a)(iii). We will not decouple the two types of education and state that the BEA can go toward only basic education.
¶ 25 Chapter 518, part V as a whole provides education funding for all Washington State students. Its individual sections specify how that funding will be appropriated and each section "distinctly specif[ies] the sum appropriated, and the object to which it is to be applied." CONST. art. VIII, § 4. Section 502 applies the BEA to the education of every student in Washington, sections 503 and 504 state how the BEA will be paid out to teachers, and then section 507 applies excess cost allocations toward special education students. In the absence of any instruction from the legislature that the BEA must go to basic education (to the exclusion of special education), we hold that article VIII, section 4 is not violated.

CONCLUSION
¶ 26 We affirm the Court of Appeals. We hold that the Court of Appeals applied the proper standard when it ruled that the Alliance must prove that the State underfunded basic education "beyond a reasonable doubt." We also hold that we must consider the BEA when determining whether the State underfunds special education. When the BEA is included, the Alliance has not proved beyond *9 a reasonable doubt that the State underfunds special education.
WE CONCUR: BARBARA A. MADSEN, Chief Justice, CHARLES W. JOHNSON, GERRY L. ALEXANDER, MARY E. FAIRHURST and JAMES M. JOHNSON, Justices.
STEPHENS, J. (concurring).
¶ 1 I concur in the result reached by the majority. Properly understood and considered as a whole, the State funding mechanism for special education satisfies the mandate of article IX, section 1 of the Washington Constitution.
¶ 2 Given the majority's analysis of the statutory scheme and the limited evidence offered by the petitioners, the entire discussion of the "beyond a reasonable doubt" standard is unnecessary and distracting. The majority holds: "`Beyond a reasonable doubt' in this context merely means that based on our respect for the legislature, we will not strike a duly enacted statute unless we are `fully convinced, after a searching legal analysis, that the statute violates the constitution.'" Majority at 5 (quoting Island County v. State, 135 Wash.2d 141, 147, 955 P.2d 377 (1998)). I take the majority at its word. To the extent the concurrence and dissent criticize use of the "beyond a reasonable doubt" standard as a constitutional burden or level of scrutiny, such criticism overstates the majority's holding. Recognizing the importance of deference to the legislature in this context no more defines the level of scrutiny than, for example, when we recognize deference to a statute affecting speech rights, yet apply a level of exacting scrutiny that requires a compelling justification to uphold the statute. See State ex rel. Wash. State Pub. Disclosure Comm'n v. Wash. Educ. Ass'n, 156 Wash.2d 543, 130 P.3d 352 (2006), abrogated by Davenport v. Wash. Educ. Ass'n, 551 U.S. 177, 127 S.Ct. 2372, 168 L.Ed.2d 71 (2007).
¶ 3 The debate between the majority and the dissent and concurrence nonetheless highlights what has been described as the "elephant in the room." See generally Scott R. Bauries, Is There an Elephant in the Room?: Judicial Review of Educational Adequacy and the Separation of Powers in State Constitutions, 61 ALA. L.REV. 701 (2010). There is an inherent tension between the court's duty to construe our state constitution, on the one hand, and appropriate deference to legislative policy-making, on the other. This tension is especially palpable in the education context because article IX expresses an affirmative obligation of the State that we have recognized corresponds to a positive right held by school children. Seattle Sch. Dist. No. 1 v. State, 90 Wash.2d 476, 510-14, 585 P.2d 71 (1978). We observed in Seattle School District that
[b]y imposing upon the State a paramount duty to make ample provision for the education of all children residing within the State's borders, the constitution has created a "duty" that is supreme, preeminent or dominant. Flowing from this constitutionally imposed "duty" is its jural correlative, a correspondent "right" permitting control of another's conduct."
Id. at 511-12, 585 P.2d 71 (footnotes omitted).
¶ 4 The unique stature of the positive right under article IX should cause us to look carefully before repeating general precepts of constitutional interpretation from other contexts. In the typical case in which legislation is challenged on constitutional grounds, the question is whether the legislature has overstepped the bounds of its authority or impermissibly encroached on a recognized individual liberty. See, e.g., Island County, 135 Wash.2d 141, 955 P.2d 377 (holding statute authorizing creation of "community councils" in certain counties was unconstitutional "special law"). In contrast, protection of a positive or "true" right, Seattle Sch. Dist., 90 Wash.2d at 513 n. 13, 585 P.2d 71, may require judicial enforcement of an affirmative obligation of the State, with a view toward "whether a challenged law achieves, or is at least likely to achieve, the constitutionally prescribed end...." Helen Hershkoff, Positive Rights and State Constitutions: The Limits of Federal Rationality Review, 112 HARV. L.REV. 1131, 1137 (1999). This follows from the recognition that state constitutions are more than a set of negative restraints on *10 governmental power. Provisions such as article IX declare and serve important normative goals.
¶ 5 I offer these observations to emphasize that we make no decision today about the proper constitutional lens through which to examine positive rights, generally, or the mandate of article IX in particular. The fundamental difference between such rights and other, negative rights or liberties is something we touched upon in Seattle School District and have not returned to since. It raises important questions that must be considered, but that consideration awaits another day.
I CONCUR: Justice MARY E. FAIRHURST.
CHAMBERS, J. (concurring in part/dissenting in part).
¶ 6 I concur with the majority in result. The paramount duty of the State is to provide a general and uniform education for all of our children, including those with special needs. WASH. CONST. art. IX, § 1. Article IX creates rights and imposes duties that this court will enforce. Seattle Sch. Dist. No. 1 v. State, 90 Wash.2d 476, 503, 585 P.2d 71 (1978). Our responsibility to enforce the constitution and protect the rights of individuals is found within the same constitutional tapestry as the legislature's power and duty to make the laws and the hard decisions about spending the State's money. See generally Hale v. Wellpinit Sch. Dist. No. 49, 165 Wash.2d 494, 503-07, 198 P.3d 1021 (2009). Our constitutional structure itself demands our due regard for the legislature, and we should not find legislative action unconstitutional unless we are confident that our constitution has been offended. Id. at 507, 198 P.3d 1021; Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 149 Wash.2d 660, 670-71, 72 P.3d 151 (2003). In this case, I cannot say that the legislature has violated the constitution through its funding formulas for allocating state resources to students with special needs. Thus, I join sections II and III of the majority opinion in result.
¶ 7 However, I cannot join the majority's holding that the "party challenging a statute's constitutionality must prove it unconstitutional `beyond a reasonable doubt.'" Majority at 4. Simply put, and despite the majority's words to the contrary, "beyond a reasonable doubt," as a burden on a party, is an evidentiary standard. At common law, "beyond a reasonable doubt" was a burden on the court; that the court must be persuaded, beyond a reasonable doubt, that a legislative enactment violated the constitution before we would take the heavy step of declaring the work of the people's representatives unconstitutional. In my view, that is where the burden should remain: on us, as a recognition of our respect for our coordinate branch of government, and not on an individual bringing a challenge. As we said more than a century ago,
it is settled by the highest authority that a legislative enactment is presumed to be constitutional and valid until the contrary clearly appears. In other words, the courts will presume that an act regularly passed by the legislative body of the government is a valid law, and will entertain no presumptions against its validity. And when the constitutionality of an act of the Legislature is drawn in question the court will not declare it void unless its invalidity is so apparent as to leave no reasonable doubt upon the subject.
State v. Ide, 35 Wash. 576, 581-82, 77 P. 961 (1904) (citing THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS 252-54 (7th ed. 1903) (1868) (overruled in part by Town of Tekoa v. Reilly, 47 Wash. 202, 91 P. 769 (1907))).[1]
*11 ¶ 8 To the extent that Justice Sanders' opinion reflects my foregoing opinions, I concur in his dissent.
I CONCUR: JAMES M. JOHNSON, Justice.
SANDERS, J. (dissenting).
¶ 9 The State's "paramount duty" is "to make ample provision for the education of all children" in Washington. CONST. art. IX, § 1. Because the State does not fully fund special education, I dissent.

I. The "beyond a reasonable doubt" standard provides an unwarranted presumption in favor of legislation that is constitutionally challenged
¶ 10 The majority applies a misguided and unwarranted evidentiary standard of proof that bestows a presumption of constitutionality on legislative acts unless proved otherwise "beyond a reasonable doubt." The issue in this case is whether the legislature's special education funding scheme, provided by statute, is constitutional, or, to put it another way, whether it meets the State's "paramount duty ... to make ample provision for the education of all children...." CONST. art. IX, § 1. The correct standard of review is "[w]e presume statutes are constitutional and review challenges to them de novo." Ludvigsen v. City of Seattle, 162 Wash.2d 660, 668, 174 P.3d 43 (2007). Similarly, whether the State has fulfilled its constitutional mandate is a question of law once the facts are established.
¶ 11 Once a statute is challenged, any presumption in favor of its constitutionality is inappropriate. Presumptions create probabilities; "[e]videntiary presumptions exist because the establishment of an intermediate fact more probably than not establishes the ultimate fact, and the intermediate fact is more capable of proof." Garland v. Cox, 472 F.2d 875, 878-79 (4th Cir.1973) (citing EDWARD W. CLEARY, McCORMICK'S HANDBOOK ON THE LAW OF EVIDENCE § 343 (2d ed. 1972)). A presumption "is merely a procedural device dictating a particular result only in the absence of contradictory evidence." Id. at 879.
¶ 12 "Presumptions ... may be looked on as the bats of the law, flitting in the twilight, but disappearing in the sunshine of actual facts." Mackowik v. Kansas City, St. J & C.B.R. Co., 196 Mo. 550, 94 S.W. 256, 262 (1906) (internal quotation marks omitted). Once there is contrary evidence, the presumption disappearswith the facts established, there is no need for a procedural device that makes a fact more probable or not. Garland, 472 F.2d at 879 ("The moment that contravening evidence is presented from any source, the presumption vanishes completelyas if it had never existed."). Then, "the case is in the judge's hands, free from any rule." Stumpf v. Montgomery, 101 Okla. 257, 226 P. 65, 69 (1924). To continue to apply the presumption is "but to play with shadows and reject substance." Mackowik, 94 S.W. at 263. The correct and substantive standard of review of a challenge to a statute's constitutionality is de novo.
¶ 13 Instead, the majority asserts, "it is well established that statutes are presumed constitutional and that a statute's challenger has a heavy burden to overcome that presumption; *12 the challenger must prove that the statute is unconstitutional beyond a reasonable doubt." Majority at 4.[1] The majority claims it applies the "beyond a reasonable doubt" standard of proof not as an evidentiary threshold, but as a means of showing "respect for the legislature." Id. at 5. However, proper "respect" for the legislature does not require abdication of judicial review. That would come at the expense of the independence of the judiciary, our system of checks and balances, the individual challenger, and, in this case, the children of our State.
¶ 14 The majority claims it imposes a "demanding standard" on challengers because it presumes the legislature "`considered the constitutionality of its enactments ...'." Id. at 4 (quoting Tunstall v. Bergeson, 141 Wash.2d 201, 220, 5 P.3d 691 (2000); see id. ("`The reason for this high standard is based on our respect for the legislative branch of government as a co-equal branch of government, which, like the court, is sworn to uphold the constitution.'" (quoting Island County v. State, 135 Wash.2d 141, 147, 955 P.2d 377 (1998)))). But this is at odds with bedrock American jurisprudence.
¶ 15 Chief Justice John Marshall in Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803), held:
The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?
The Founders were not so naïve as to rely on the legislature to judge the constitutionality of its own enactments.[2] As James Madison envisioned, it is the judiciary's responsibility to be "an impenetrable bulwark against every assumption of power in the legislative or executive" branches. Creating the Bill of Rights: The Documentary Record from the First Federal Congress 83-84 (Helen E. Veit et al. eds., 1991) (quoting 1 Annals of Cong. 439 (Joseph Gales ed., 1789)). The judiciary cannot protect against an overreaching legislature if every enactment is presumed constitutional unless proved otherwise "beyond a reasonable doubt," giving the legislature, simply because it is the legislature, an advantage against any challenger's assertion to the contrary. See also Island County, 135 Wash.2d at 158, 955 P.2d 377 (Sanders, J., concurring) ("By necessity any form of deference to the legislative branch, however slight, is a corresponding burden to the citizen who relies upon an independent and impartial judiciary to vindicate and protect his legal rights.").
¶ 16 Concern that the legislature might overstep its constitutional authority is certainly not unfounded. In the midst of the Great Depression, President Franklin D. Roosevelt pressed Congress to pass the Bituminous Coal Conservation Act of 1935 without concern for possible constitutional restrictions. Writing to the chairman of the House Ways and Means Committee, President Roosevelt stated, "I hope your committee will not permit doubts as to constitutionality, however reasonable, to block the suggested legislation." Letter from Franklin D. Roosevelt to Samuel B. Hill (July 6, 1935), in 4 THE PUBLIC PAPERS AND ADDRESSES OF FRANKLIN D. ROOSEVELT 298 *13 (Samuel I. Rosenman ed., 1938). Roosevelt urged, "[A]ll doubts should be resolved in favor of the bill, leaving to the courts, in an orderly fashion, the ultimate question of constitutionality." Id. at 297, 955 P.2d 377. Thus even President Roosevelt acknowledged the courts have a truly independent, and ultimate, role to play in matters of judicial review. The legislature may test the limits of its constitutional authority, but it remains the responsibility of the judiciary to determine them. See Marbury, 5 U.S. at 176 ("It is, emphatically, the province and duty of the judicial department, to say what the law is."). Obviously, deference to the legislature in matters of constitutional interpretation weakens the judiciary's ability to check the legislature's unconstitutional exercise of power, and it defeats the very separation of powers to which the majority's lips pay service.
¶ 17 A continuing presumption of statutory constitutionality favors the legislature at the expense of the individual who comes before the court to protect his constitutional rights. See Robert F. Utter, Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights, 7 U. PUGET SOUND L.REV. 491, 507 (1984) (explaining the "beyond a reasonable doubt" standard, "founded on ... a presumption of the honorable intent of executive and legislative officials who have also sworn to uphold the constitution, makes it difficult to apply the Declaration [of Rights] at all, let alone in an independent manner"). Such a standard is warranted in the criminal context where the "beyond a reasonable doubt" standard properly applies to rigorously protect the presumption of innocence. But when applied to a question of statutory constitutionality, the standard serves no such imperative function. See id. at 508 ("Rather, [the standard] serves to undercut the fundamental rights of Washington citizens, and should therefore be discarded.").
¶ 18 Moreover, any presumption in favor of legislative constitutionality is particularly inappropriate when applied to challenges of education statutes. It is this State's "paramount duty" to provide education to all Washington children. CONST. art. IX, § 1. All three co-equal branches of government owe this duty:
[I]n the context employed by Const. art. 9, § 1, the paramount duty is imposed upon the sovereign body politic or governmental entity which comprises the "State." While the Legislature is an essential element thereof, it is only one segment of that intricate governmental body politic upon which has been placed the paramount duty.

Seattle Sch. Dist. No. 1 v. State, 90 Wash.2d 476, 512, 585 P.2d 71 (1978) (footnote omitted). The majority quotes Seattle School District for the proposition that "`[w]hile the Legislature must act pursuant to the constitutional mandate to discharge its duty, the general authority to select the means of discharging that duty should be left to the Legislature.'" Majority at 5 (alteration in original) (quoting Seattle Sch. Dist., 90 Wash.2d at 520, 585 P.2d 71). I agree, but the legislature's authority to select the means does not preclude judicial authority to review the selected means for compliance with the constitution. See Seattle Sch. Dist., 90 Wash.2d at 516, 585 P.2d 71 ("[I]t is not seriously argued that this places the State's duty to make such provision beyond all judicial scrutiny."). To fulfill the "paramount duty" imposed by article IX, section 1, shared by all three branches of government, the judiciary must retain its role as the independent arbiter of constitutional and statutory interpretation to ensure education legislation makes "ample provision" for the state's students.

II. The State underfunds special education
¶ 19 Accepting the funding scheme at face value, the State has underfunded education in violation of article IX, section 1 on its face.
¶ 20 The very legislative scheme at issue for funding for special education students in Washington begins with each student's Basic Education Allocation (BEA) distributed to school districts based on enrollment of "full time equivalent" students. RCW 28A.150.250. This includes special education students. Moreover, "[s]chool districts shall ensure that special education students as a *14 class receive their full share of the general apportionment allocation...." Laws of 2005, ch. 518, § 507(1). The BEA funds basic education. See RCW 28A.150.250 (providing "[b]asic education shall be considered... fully funded" by the basic education allocation).
¶ 21 Special education is funded in addition to basic education. The special education funding statute directs:
Funding for programs operated by local school districts shall be on an excess cost basis from appropriations provided by the legislature for special education programs for students with disabilities and shall take account of state funds accruing through RCW 28A.150.250, 28A.150.260, federal medical assistance and private funds ..., and other state and local funds, excluding special excess levies.
RCW 28A.150.390 (emphasis added). The 2005 education appropriations act provides, "[t]o the extent a school district cannot provide an appropriate education for special education students ... through the general apportionment allocation, it shall provide services through the special education excess cost allocation funded in this section." Laws of 2005, ch. 518, § 507(1). The section provides 0.9309 of the BEA for every special education student in the district in addition to the BEA for every enrolled full-time equivalent student. Id. § 507(5)(a)(ii).
¶ 22 The additional 0.9309 is an average cost funding formula similar to the BEA the lower special education costs of one student offset the higher costs for providing special education to another student. However, it does not purport to cover the full amount of special education costs. To help reduce the deficit, districts may also apply for "safety net awards." Id. § 507(8). The safety net oversight committee considers awarding funds when a district demonstrates "that all legitimate expenditures for special education exceed all available revenues from state funding formulas." Id. § 507(8)(a). After a district demonstrates need, the committee "shall then consider the extraordinary high cost needs of one or more individual special education students." Id. § 507(8)(b). The current threshold for state funding for an "extraordinary high cost" student is $15,000. Sch. Dists.' Alliance for Adequate Funding of Special Educ. v. State, 149 Wash. App. 241, 251, 202 P.3d 990 (2009).
¶ 23 If a student's special education costs are above the 0.9309 of BEA average but are not offset by another student's lower costs, the district can recover the deficit from the State only if the student has extraordinarily high costs, i.e., above $15,000. In 2005-2006, eligible school districts recovered only $35 million from the safety net funds (out of a demonstrated need for $147 million). Id. at 265, 202 P.3d 990. The underfunded gap was therefore $112 million. Id.
¶ 24 The district must provide an "appropriate" special education with the general apportionment allocation (the BEA), and only when a district exhausts the BEA will the State provide an "excess cost allocation" under the appropriations law. See Laws of 2005, ch. 518, § 507(1). This appears to support the majority's position that the BEA for each special education student counts toward a district's special education funding. Majority at 6.
¶ 25 However, the majority disregards the very premise of the BEA. The BEA provides basic education services, services the special education student may, to some degree, use every day and throughout the day. See Laws of 2005, ch. 518, § 507(2)(a)(i), (iii) ("Special education students are basic education students first; ... and ... [s]pecial education students are basic education students for the entire school day."). A district exhausts a special education student's share of the BEA when it provides the student's basic education services. To the extent a district cannot provide the appropriate education to any student through basic education services and curriculum, the district must provide adequate and "ample" special education services. See id. § 507(1). All special education services are additional to a basic educationan "excess cost" the State must fund. See RCW 28A.150.390; Laws of 2005, ch. 518, § 507(1). The BEA is simply not a source of State funding for special education and cannot be as a matter of law.
*15 ¶ 26 The majority claims, "[f]or us to conclude the BEA should not be included in calculations of how much funding goes to special education, we would have to agree with the Alliance's contention that basic education and special education are in entirely separate realms." Majority at 6. Basic education and special education are not in separate realmsa student often receives basic education with additional special education servicesbut they are funded separately.
¶ 27 Excluding the BEA from special education funds acknowledges a special education student receives a fully funded basic education throughout the day as required by law. See Laws of 2005, ch. 518, § 507(2)(a)(i), (iii). A basic education student's share of the BEA is expended on his or her basic education. Accordingly, a special education student can only receive his or her "full share of the general apportionment allocation" as required by section 507(1) if the school district expends his or her share on basic education services and only basic education services. See id. § 507(1).
¶ 28 Instead, the majority asserts, "[t]he BEA need not be used only for the basic education of special education students." Majority at 7. But that is exactly what the BEA isit is the amount it costs to provide the average student a basic education. Leftover funding from educating a cheaper student offsets the more expensive basic education of another student. The BEA "fully fund[s]" basic education. See RCW 28A.150.250. In a formula based on averages, there is no leftover pot of BEA funds to pay for nonbasic education services such as special education.
¶ 29 "[F]or special education students, special education and basic education are inextricably linked. When special education students are receiving special education services, they are also receiving basic education." Majority at 8. Although a special education student may receive some basic education, the special education is in addition to the basic education as a matter of law. But the majority does not allow for the legislative scheme that the student's basic education is funded by the BEA, and his or her special education is an "excess cost" the State must fund additionally. A school district exhausts a special education student's BEA share on basic education. See Laws of 2005, ch. 518, § 507(1), (2)(a)(i), (iii). When the BEA is excluded, eligible school districts faced a funding deficit of $112 million for special education in the 2005-2006 school year. Sch. Dists.' Alliance, 149 Wash.App. at 254-55, 202 P.3d 990.
¶ 30 This court's role is not to "micromanage education" but rather to provide broad constitutional guidelines in which the legislature may operate to fulfill the mandate of article IX, section 1. See Tunstall, 141 Wash.2d at 223, 5 P.3d 691; Seattle Sch. Dist., 90 Wash.2d at 518, 585 P.2d 71. Only arithmetic, not micromanagement, is needed to determine that a deficit of $112 million in special education funding is a violation of this State's "paramount duty" by application of the very statutes the State claims are constitutionally adequate.
¶ 31 I dissent.
NOTES
[1] Contrary to the dissent's suggestion, this standard is not "abdication of judicial review." Dissent at 12. Looking to the Founders' intentions, as the dissent instructs, we note that Alexander Hamilton also cautioned appropriate limits of judicial review:

It can be of no weight to say that the courts, on the pretense of a repugnancy, may substitute their own pleasure to the constitutional intentions of the legislature.
THE FEDERALIST No. 78, bk. 2, at 103 (Alexander Hamilton) (New York, Tudor Publ'g Co. 1937). As Hamilton suggests, looking at the whole text, the separation of powers requires a careful balance by the judiciary that respects the role and authority of the legislature, while assuring its adherence to the constitution. This court's reasoned judgment for nearly the past century has been that the "beyond a reasonable doubt" standard for reviewing the constitutionality of a statute achieves the appropriate balance.
[2] The dissent highlights the potential for an unlawful funding gap if a district faces a situation where some students' special education costs are above the average allocation and are neither offset by other students' lower costs nor high enough to qualify for safety net funds. Dissent at 14. The burden to show that such a scenario exists is on the Alliance. The trial court's formulation would allow the Alliance to prove such a gap, should it exist, but appropriately requires that BEA funds be included in the calculation as part of the sum of the average allocation for special education students.
[3] The Alliance asserts that the 1077 accounting methodology, which allocates the cost of special education teachers whose duties include both basic and special education, proves that the BEA is used up entirely on basic education services. This methodology merely exists to ensure that special education students as a class receive basic education support and supplemental special education revenues. The 1077 accounting methodology in no way proves that the BEA is used up entirely on basic education services.
[4] The Alliance did not brief this issue in the trial court or the Court of Appeals.
[1] Cooley in turn cites an 1834 opinion from Massachusetts, which states the problem thus:

In considering the question, whether the act passed June 5, 1830, providing for the enclosure and appropriation of Cambridge common is a constitutional act, having the force and effect of law, the delicacy and importance of the subject may render it not improper to repeat what has been so often suggested by courts of justice, that when called upon to pronounce the invalidity of an act of legislation passed with all the forms and solemnities requisite to give it the force of law, courts will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light on the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt. Still however it cannot be doubted, and I believe it is nowhere denied, that in a limited government like ours, acting under a written constitution with numerous and detailed provisions, a constitution which is in itself perpetual and irrepealable except by the people themselves, and which imposes many restraints upon the power of the legislature by express provisions and many others by necessary implication, and where the same constitution has provided for the establishment of a judiciary as a coördinate department of the government, with power in all cases to expound the laws, to declare what has and what has not the force of law, and to apply them to the investigation and adjustment of the rights, duties, and obligations of citizens, in the actual administration of justice, it is clearly within the power, and sometimes the imperative duty of courts, to declare that a particular enactment is not warranted by the power vested in the legislature, and therefore to the extent, to which it thus exceeds the power of the legislature, it is without efficacy, inoperative, and void.
In re Wellington, 33 Mass. (16 Pick.) 87, 95-96 (1834) (emphasis added), cited with approval by COOLEY, supra, at 252-53 & n. 1.
[1] The majority cites Parrott & Co. v. Benson, 114 Wash. 117, 194 P. 986 (1921), to support this standard's longevity. Majority 4. The court in that case applied the "beyond a reasonable doubt" standard to a question of statutory constitutionality, but the court did not cite any support for the "settled" standard. Benson, 114 Wash. at 122, 194 P. 986.
[2] Alexander Hamilton considered this problem:

If it be said that the legislative body are themselves the constitutional judges of their own powers and that the construction they put upon them is conclusive upon the other departments it may be answered that this cannot be the natural presumption where it is not to be collected from any particular provisions in the Constitution.... It is far more rational to suppose that the courts were designed to be an intermediate body between the people and the legislature in order, among other things, to keep the latter within the limits assigned to their authority. The interpretation of the laws is the proper and peculiar province of the courts.
The Federalist No. 78, at 438-39 (Alexander Hamilton) (Isaac Kramnick ed., Penguin Books 1987) (1788).