# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| In re the Detention of | ) | No. 76004-1-I |
|  | ) |  |
| K.P.-M., | ) | DIVISION ONE |
|  | ) |  |
| Appellant. | ) |  |
|  | ) |  |
|  | ) | UNPUBLISHED |
|  | ) |  |
|  | ) | FILED: <u>April 30, 2018</u> |
|  | ) |  |

Cox, J. – Based on our recent holding in <u>In re Detention of S.E.</u>,[1] K.P.-M. did not have a right to jury trial in this probable cause hearing for involuntary treatment. We further conclude that sufficient evidence supported the trial court's order committing her to involuntary treatment. We affirm.

According to police reports, Tukwila police detained K.P.-M. after she confronted two city workers on the street. K.P.-M. held a kitchen knife to her neck and told them to run her over. She told them she had nothing to live for.

A designated mental health professional petitioned for her initial detention. Highline Hospital then filed a petition seeking to hospitalize K.P.-M. for 14 days of involuntary treatment.

The trial court held a probable cause hearing. The State presented one witness, Dr. Bethany O'Neill, a licensed clinical psychologist.

---

[1] 199 Wn. App. 609, 400 P.3d 1271 (2017), <u>review denied</u>, 189 Wn.2d 1032 (2018).

The trial court granted the petition based on Dr. O'Neill's testimony. It found that K.P.-M. suffered from bipolar disorder that caused her to present a likelihood of serious harm to herself and others. It accordingly ordered her detained and remanded for 14 days to Navos inpatient services.

K.P.-M. appeals.

## JURY TRIAL RIGHT

K.P.-M. argues that the trial court unconstitutionally violated her right to a jury trial. As such, she argues that RCW 71.05.240, the statute governing the hearing at issue, which does not provide for a jury trial, is unconstitutional. We disagree.

We review de novo a constitutional challenge to a statute, and presume the statute to be constitutional.[2] The party challenging a present statute's constitutionality also bears the burden to show beyond a reasonable doubt that the statute is unconstitutional.[3] As for the right to jury trial, he must "show that territorial authority in effect upon the adoption of the Washington Constitution provided for a right to a jury trial in a proceeding analogous to the challenged statutory proceeding."[4]

---

[2] Id.

[3] Sch. Districts' Alliance for Adequate Funding of Special Educ. v. State, 170 Wn.2d 599, 605, 244 P.3d 1 (2010).

[4] S.E., 199 Wn. App. at 614.

2

We recently decided this precise issue. We concluded in S.E. that no jury right attaches in a RCW 71.05.240 hearing, because no such right existed at the time our constitution was ratified.[5] We apply that conclusion here.

To the extent that this case raises any new issues, we conclude they do not change our conclusion. Fatal to K.P.-M.'s argument, the jury trial right she argues only attached, according to Section 1632, upon demand.[6] Failure to make such a demand waived the right.[7] Thus, even were we to accept her constitutional argument, because she did not demand a jury below, she waived any putative jury right.

K.P.-M. argues that this court wrongly decided S.E. We disagree.

She states that "[t]he Court framed the issue as whether persons accused of insanity had to wait longer than 17 days (the 3-day initial detainment plus the 14-day detainment on the initial petition in 71.05 proceedings) before receiving a jury trial." She contends that "[t]he point is that people in 1889 were entitled to have a jury ultimately adjudicate the issue of insanity."

That is not the point. We applied the supreme court's controlling analysis in S.E.[8] We determined the scope of the jury right at statehood and whether "'the type of action at issue is similar to one that would include the right to a jury trial at

---

[5] Id. at 627-28.

[6] In re the Matter of Ellern, 23 Wn.2d 219, 224, 160 P.2d 639 (1945).

[7] Id.

[8] S.E., 199 Wn. App. at 615 (quoting In re Det. of M.W., 185 Wn.2d 633, 662, 374 P.3d 1123 (2016)).

that time.'"[9] Thus, the question was not so general as whether a person was entitled to have a jury adjudicate insanity. It was whether the adversarial hearing at 17 days created under RCW 71.05.240 is analogous to the proceeding with a jury right under Section 1632. An RCW 71.05.240 hearing takes place at 17 days, and is an adversarial determination. The Section 1632 jury proceeding is a trial following an initial nonadversarial judicial determination of detention and up to 60 days or more of pretrial detention.[10] Based on these structural distinctions, coupled with the practical realities at the time of statehood, our framers would not have applied the jury right to a hearing of the type created by RCW 71.05.240.[11]

It is not enough to say that both proceedings were analogous because they involve a finding of insanity. They are not procedurally analogous, and thus the jury right, as conceived at statehood, would not have attached.

## SUFFICIENCY OF THE EVIDENCE

K.P.-M. argues that insufficient evidence supports the trial court's ninth finding and, as a result, its order to grant the State's petition. We disagree.

RCW 71.05.240(3)(a) requires the trial court to order a person detained for 14 days of involuntary treatment upon finding "by a preponderance of the evidence that such person, as the result of mental disorder, presents a likelihood of serious harm, or is gravely disabled," and that no appropriate alternatives

---

[9] Id. (quoting In re Det. of M.W., 185 Wn.2d at 662).

[10] Id. at 626.

[11] See id. at 626-27.

exist. The State bears the burden to prove by a preponderance of the evidence that the person poses a risk of harm to herself or others because of a mental disorder.[12]

RCW 71.05.040 provides that persons:

impaired by chronic alcoholism or drug abuse . . . shall not be detained for evaluation and treatment or judicially committed solely by reason of that condition unless such condition causes a person to be gravely disabled or as a result of a mental disorder such condition exists that constitutes a likelihood of serious harm.

Notably, this exception specifies its application to impairment caused by substance abuse disorder, not to impairment by drug-induced psychosis.

In reviewing an involuntary commitment order, we consider whether substantial evidence supports the findings and if the findings support the conclusions of law and judgment.[13] "'Substantial' evidence is the quantum of evidence sufficient to persuade a fair-minded person of the truth of the declared premise."[14] Unchallenged findings are verities on appeal.[15]

The issue here is narrow. K.P.-M. does not challenge the sufficiency of the evidence supporting the trial court's finding that she has a mental disorder, specifically bipolar disorder. She does not challenge the finding that she poses a risk of harm to herself or others. Thus, these are verities on appeal.

---

[12] In re Det. of H.N., 188 Wn. App. 744, 762, 355 P.3d 294 (2015).

[13] Id.

[14] Id.

[15] State v. Bonds, 174 Wn. App. 553, 562, 299 P.3d 663 (2013).

She argues instead that the evidence is not sufficient to support the finding that her mental disorder, rather than drug use, caused her to pose such a risk.

Accordingly, her challenge is directed at the sufficiency of the evidence supporting the ninth finding. That finding states that "[t]he court finds that the Respondent's actions described herein were caused by her paranoia and delusions (as a result of her bipolar disorder) and not caused by her use of cocaine, methamphetamines, or other substances prior to hospitalization."

The evidence at trial consisted of testimony from Dr. O'Neill, a licensed clinical psychologist, employed at Highline Hospital. Dr. O'Neill is also a records custodians for Navos Hospital and St. Francis Hospital within the same records system. She based her testimony on K.P.-M.'s hospital records and her own personal interactions. Based on these she testified that K.P.-M. has a mental disorder. She further opined that this disorder, bipolar disorder, had "a substantial adverse effect on the respondent's cognitive and volitional functions," and she presented a significant risk of physical harm to herself and to others.

Dr. O'Neill testified that K.P.-M. had previously been at Navos from July 28 to August 19 for "danger to self and others."

She testified that at St. Francis on September 23, K.P.-M., pulled out a hammer, and swung it at a security guard. On the same day, K.P.-M. yelled that a nurse assisting her was "evil," screamed profanities, and struck the nurse with closed hands.

On October 4, K.P.-M. asked a nurse why she was in the morgue, and then became violent with staff until they put her in mechanical restraints. On the same day, she threatened to bite a nurse's throat, further threatening that "I'm going to find your kids and rip their heads off . . . I'm going to kill you." She threatened to "buy a gun and shoot every single one of you."

On October 5, she "began making suicidal and homicidal ideation comments stating that she wants to slit her wrist." She also threatened to kill staff that day.

Dr. O'Neill indicated from personal interaction on October 6, that K.P.-M. presented as "tangential, delusional, talking about delusional things, did make a statement about being able to find her son if she died or was in the morgue, and continued to be labile." K.P.-M.'s made statements that "were not making sense."

On October 7, K.P.-M. insulted and spat on a nurse.

On October 8, K.P.-M. was "yelling, loud, agitated, throwing the garbage cans around." She later pushed over a stack of dinner cart trays and spit on a staff member. She threw a bowl of pasta across the room and a carton of milk against the wall close to a nurse's head.

An initial psychiatric evaluation was performed that day by Pamela Abramowitz. Dr. O'Neill, reading Abramowitz's report, testified that K.P.-M.:

> remain[ed] delusional, stating 'They raped me in the hospital. They held me down and stuffed things in my vagina.' She then in a tangential manner started talking about Iran and music on the radio, and the Iraq shit. The patient then returned her focus to her son,

stating, 'If I do not find out where he is tomorrow, it will get drastic.'[16]

When asked whether she was suicidal, she stated that she was "not going to hurt anybody else."

On October 9, she "was irritable and verbally loud, yelling and cursing at staff without any provocation. She [was] also agitated, banging the bedroom window, and at one point kicked the housekeeping cart when on her way back to her room."

On October 10, she continued to "verbally accost[] anyone in the vicinity" and attempted to strike another patient.

Based on all this evidence, Dr. O'Neill opined that K.P.-M. suffered from a mental disorder that caused her to pose a significant risk of physical harm to herself and others.

K.P.-M.'s contention on appeal is that the State failed to show that all this behavior was caused by her mental disorder rather than drug use.

K.P.-M. was subject to a toxicology screen on October 5 at 8:00 a.m. That screen showed that she had amphetamines, cannabinoids, and cocaine in her system. Dr. O'Neill testified that these drugs, especially combined, could induce a form of psychosis. She further testified that any such condition would resolve and the drugs would leave a person's system after two to three days, "and certainly by day four."

---

[16] Report of Proceedings (October 11, 2016) at 65 (internal quotations omitted).

Based on these principles, Dr. O'Neill drew an important distinction. She explained that a person's psychotic symptoms induced by drug use, when that person suffered no mental disorder, would decrease and resolve in two to three days. By contrast, she explained that the same drug-induced symptoms experienced by a person with an underlying mental disorder would not abate. For such a person, substance use could only exacerbate the mental disorder, and the dissipation of drugs would not cause the mental disorder to abate.

The trial court considered the effect drugs might have had on K.P.-M.'s behavior. It noted that K.P.-M. had "hear[d] voices as late as the 8th of October [after drugs cleared her system], and she's engaged in violent behavior continually while she's at Navos" between July 28 to August 19.

The trial court's consideration of Dr. O'Neill's testimony fairly accounts for the concern that drugs rather than mental disorder caused K.P.-M.'s behavior. Thus, the trial court's ninth finding, that bipolar disorder caused K.P.-M. to pose a significant risk of physical harm to herself and others was supported by substantial evidence.

But K.P.-M. contends that the three day dissipation period is not absolute and, thus, drugs could have continued to cause her relevant behavior. This argument is nothing more than an alternative view of the evidence, one the trial court rejected. Thus, it fails to undercut that the finding the court made is supported by substantial evidence.

K.P.-M. argues that the trial court based its fifth finding on highly prejudicial hearsay that had been ruled inadmissible. Even if we assume K.P.-M. is correct, our conclusion remains unchanged.

Dr. O'Neill testified, based on her notes, that the police had been called because K.P.-M. had stopped traffic, holding a knife to her throat. K.P.-M. objected to this testimony as hearsay. The trial court sustained that objection but admitted the testimony only to support Dr. O'Neill's expert opinion.

Despite these rulings, the trial court found that K.P.-M. presented a substantial risk of physical harm to herself based, in part, on the facts that she had "held a kitchen knife to her own throat" and had "told city workers to run her over and told them that 'I don't have anything to live for.'"

The State does not dispute the trial court's hearsay rulings, or argue that this limited finding can be supported without the excluded testimony. But the State contends that sufficient evidence, nonetheless, supports the trial court's order. As detailed above, we agree.

K.P.-M. also argues that the trial court improperly stated certain conclusions of law as findings of fact. If she is correct, then a different standard will govern our review.[17] She is partially correct.

---

[17] See Nelson v. Duvall, 197 Wn. App. 441, 451-52, 387 P.3d 1158 (2017).

"'A conclusion of law is a conclusion of law wherever it appears,'" and will be treated as such.[18] A trial court's determination of the ultimate issue in a case constitutes a conclusion of law, however stated.[19] Thus, a trial court's determination that a person is gravely disabled or presents a likelihood of serious harm is a conclusion of law, subject to de novo review.

Here, K.P.-M. contends that the trial court's third, fifth, sixth, seventh, and tenth findings are conclusions of law in disguise. Three of these are indeed conclusions of law.

The third finding is a conclusion of law. It states that "[t]he court finds, by a preponderance of the evidence, that the respondent presents a likelihood of serious harm to herself and a likelihood of serious harm to others." This is the ultimate issue under the statute and is thus properly a conclusion of law.[20]

The seventh finding is also a conclusion of law. In it, the trial court found that the State had failed to prove that K.P.-M. is gravely disabled. Although we determine this to be a conclusion of law, our determination does not assist K.P.-M.

---

[18] Robel v. Roundup Corp., 148 Wn.2d 35, 43, 59 P.3d 611 (2002) (quoting Kane v. Klos, 50 Wn.2d 778, 788, 314 P.2d 672 (1957)).

[19] In re Det. of M.K., 168 Wn. App. 621, 624 n.4, 279 P.3d 897 (2012).

[20] RCW 71.05.240(3)(a).

The tenth finding states that, based on the risk of harm K.P.-M. posed, "the petition should be granted." This is the dispositive determination, and a conclusion of law.[21]

But the fifth and sixth findings are not conclusions of law. Both detail extensive facts the trial court found to support its determinations. Each finding categorizes the listed facts under the risk of harm K.P.-M. posed to herself, and the risk she posed to others. But the material language concerns only facts, not legal issues.

Although, we hold that the third, seventh, and tenth findings are properly designated conclusions of law, our holding on the sufficiency of the evidence remains unchanged.

## MOOTNESS

K.P.-M. argues that this case is not moot and the State does not contend otherwise. Thus, we need not further address this issue.

We affirm the trial court's order of commitment.

Cox, J.

WE CONCUR:

---

[21] Id.