# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| In re the Detention of: | ) | DIVISION ONE |
|  | ) |  |
| S.E., | ) | No. 74917-0-I |
|  | ) |  |
|  | ) | OPINION PUBLISHED IN PART |
| Appellant. | ) |  |
|  | ) |  |
| _____ | ) | FILED: July 10, 2017 |

DWYER, J. — Today we must decide whether the Washington Constitution requires that a jury be seated to determine the issues presented in a probable cause hearing commenced pursuant to RCW 71.05.240, a mental illness statute. We hold that it does not. Because no jury was required, and because substantial evidence supports the trial court's findings of fact, we affirm.[1]

I

S.E. was involuntarily committed to Fairfax Hospital for an initial period of evaluation and treatment due to concerns about her dangerous mental disorder. An evaluating physician from Fairfax petitioned the superior court to authorize an additional 14 days of commitment to allow for further evaluation and treatment of S.E.

At the resulting probable cause hearing, the superior court determined by a preponderance of the evidence that S.E., due to a mental disorder, presented a

---

[1] The evidentiary sufficiency contest is resolved in the unpublished portion of this opinion.

significant risk of serious harm to others and that she was gravely disabled. The superior court granted the petition, authorizing 14 days of additional commitment for evaluation and treatment.

S.E. now appeals.

## II

## A

Washington's statutory scheme regulating the involuntary detention of those persons suspected of suffering from a dangerous mental illness was enacted in 1973. Codified at chapter 71.05 RCW, the statutory scheme provides for various lengths of detention for evaluation and treatment and for various decision-makers.

The initial detention period provided for is 72 hours. RCW 71.05.150, .180. For this detention period to commence, a designated mental health professional must first receive and investigate allegations that a person, "as a result of a mental disorder," "presents a likelihood of serious harm" or "is gravely disabled." RCW 71.05.150(1)(a).[2] If the mental health professional is satisfied as to the truth of the allegations and determines that the person will not voluntarily seek treatment, the professional may submit a petition to the superior court seeking authorization for a 72-hour commitment period for evaluation and treatment. RCW 71.05.150(1). Thereafter, upon review of the petition, the superior court may—in an uncontested determination—issue an order to detain

---

[2] RCW 71.05.153 provides for an emergency 72-hour detention period, which is not here at issue.

the person if the judge is satisfied that probable cause supports the petition and that the person has refused or failed to voluntarily accept appropriate evaluation and treatment. RCW 71.05.150(2)(a).

Thereafter, if further commitment is warranted, the evaluating professional can petition for another 14 days of commitment. RCW 71.05.230. After a 14-day petition is filed, the superior court must—within 72 hours of the person's initial detention—hold a proceeding referenced as a probable cause hearing. RCW 71.05.240(1). At the probable cause hearing, the petitioner must show, by a preponderance of the evidence, that the person identified in the petition, "as the result of mental disorder, presents a likelihood of serious harm, or is gravely disabled." RCW 71.05.240(3)(a). Although the probable cause hearing is adversarial, the statutory scheme does not provide for a right to a jury determination of the question whether the person's mental disorder warrants 14 additional days of commitment.

If commitment beyond the first 17 days—the initial 72-hour period followed by the 14-day period—is sought, the evaluating professional may petition for 90 or 180 days of further commitment for treatment. RCW 71.05.280, .290. Notably, upon the filing of a 90- or 180-day petition, the statutory scheme provides for a right to demand that a jury determine whether the person's mental disorder justifies the lengthier commitment period requested. RCW 71.05.310. Thereafter, a contested proceeding occurs wherein the superior court or, if demanded, a jury determines whether the petitioners have shown by clear, cogent, and convincing evidence that the commitment is justified by the person's

mental illness pursuant to the statutory grounds tailored to the lengthier commitment period requested. See RCW 71.05.310, 320(1).

If the evaluating professional determines that further commitment beyond the 90- or 180-day period is necessary, a petition seeking a further 180-day commitment may be filed. RCW 71.05.320(4). Thereafter, another contested proceeding is held—pursuant to the procedures set forth in RCW 71.05.310— and the superior court or a jury must find that the additional commitment is warranted pursuant to distinct statutory grounds tailored to the 180-day commitment request. RCW 71.05.320(6)(a). If further 180-day periods of commitment are sought, petitions are filed and heard in the same manner as provided in RCW 71.05.320(4).

B

S.E. calls our attention to a territorial statute that was in effect in 1889. This statute provided the subject of an insanity trial with the right to a jury trial on the question of whether the person was sane or insane. This, by itself, S.E. argues, establishes that—at the time of statehood—no person could be detained for any period of time based upon a belief that the person was insane without first having had a jury determine the person's insanity. On this premise, S.E. contends that RCW 71.05.240 is unconstitutional because it does not provide a person the right to a jury determination of the issues presented at a probable cause hearing. S.E.'s argument in this regard also constitutes an implied challenge to RCW 71.05.150, inasmuch as the 72-hour commitment period

provided for therein is also allowed to commence without a jury first determining the factual question of the person's sanity.

C

We review de novo a constitutional challenge to a statute, with a presumption that the statute is constitutional. In re Det. of M.W., 185 Wn.2d 633, 647, 374 P.3d 1123 (2016) (citing City of Bothell v. Barnhart, 172 Wn.2d 223, 229, 257 P.3d 648 (2011)). As the party challenging the constitutionality of a statute with regard to the jury trial right, S.E. bears the burden to show that territorial authority in effect upon the adoption of the Washington Constitution provided for a right to a jury trial in a proceeding analogous to the challenged statutory proceeding. M.W., 185 Wn.2d at 647, 662 (citing Barnhart, 172 Wn.2d at 229; Endicott v. Icicle Seafoods, Inc., 167 Wn.2d 873, 884, 224 P.3d 761 (2010)).

The Washington Constitution provides that, "The right of trial by jury shall remain inviolate." CONST. art. I, § 21.[3] In proceedings to commit a person for evaluation and treatment of a mental disorder, "the jury plays an essential role in guarding against wrongful commitment." In re Quesnell, 83 Wn.2d 224, 241, 517 P.2d 568 (1973).

To determine whether the state constitution grants the right to a jury trial in a particular proceeding, we engage in a two step analysis: "First, we determine

---

[3] "The [S]eventh [A]mendment to the United States Constitution does not apply through the Fourteenth Amendment to the states in civil trials." Sofie v. Fibreboard Corp., 112 Wn.2d 636, 644, 771 P.2d 711, 780 P.2d 260 (1989) (citing Minneapolis & St. Louis R.R. v. Bombolis, 241 U.S. 211, 36 S. Ct. 595, 60 L. Ed. 961 (1916); Walker v. Sauvinet, 92 U.S. 90, 23 L. Ed. 678 (1875)).

the scope of the right to a jury trial as it existed at the time of our founding in 1889; second, we determine if the type of action at issue is similar to one that would include the right to a jury trial at that time." M.W., 185 Wn.2d at 662 (citing Endicott, 167 Wn.2d at 884). The nature of our inquiry "'is a purely historical question, a fact which is to be ascertained like any other social, political or legal fact. The right is the historical right enjoyed at the time it was guaranteed by the Constitution.'" Wings of the World, Inc. v. Small Claims Court, 97 Wn. App. 803, 807, 987 P.2d 642 (1999) (quoting State ex rel. Goodner v. Speed, 96 Wn.2d 838, 841, 640 P.2d 13 (1982)).[4]

We look to contemporaneous legal authority as well as legal authority subsequent to statehood as representative of "the essence of the [jury trial] right's scope." Sofie v. Fibreboard Corp., 112 Wn.2d 636, 645-46, 771 P.2d 711, 780 P.2d 260 (1989) (referencing In re Ellern, 23 Wn.2d 219, 224, 160 P.2d 639 (1945); State v. Strasburg, 60 Wash. 106, 116, 110 P. 1020 (1910)); see also Speed, 96 Wn.2d at 841-42 (discussing State v. Tieman, 32 Wash. 294, 295-98, 73 P. 375 (1903)).

D

S.E. asserts that, at the time of statehood, no person could be detained for any period upon suspicion of insanity unless such detention was preceded by a

---

[4] Because S.E. challenges the constitutionality of RCW 71.05.240, S.E. has the burden of proving beyond a reasonable doubt that the statute is unconstitutional. Pierce County v. State, 159 Wn.2d 16, 27, 148 P.3d 1002 (2006) (quoting Larson v. Seattle Popular Monorail Auth., 156 Wn.2d 752, 757, 131 P.3d 892 (2006)). This burden of proof includes the burden to prove the factual basis for the claim. Pierce County, 159 Wn.2d at 27 (quoting Larson, 156 Wn.2d at 757).

court hearing at which a jury could decide the facts. She has not proved this to be true.

"[W]hatever right may have been given to a trial by jury in proceedings to adjudicate insanity by a territorial statute, a constitutional guaranty that the right to trial by jury shall remain inviolate preserves such right *to the extent given by the statute*." Sherwin v. Arveson, 96 Wn.2d 77, 83, 633 P.2d 1335 (1981) (emphasis added) (citing Ellern, 23 Wn.2d at 224).

In commitment proceedings, the jury trial right was preserved "[i]nasmuch as the Code of 1881, § 1632 . . . provided that when the mental condition of a person was the subject of judicial inquiry, he had the right to demand a jury trial." Sherwin, 96 Wn.2d at 83.

Section 1632 of the Code of 1881 read:

> The probate court of any county in this territory, or the judge thereof, upon application of any person under oath, setting forth that any person by reason of insanity is unsafe to be at large, or is suffering under mental derangement, shall cause such person to be brought before said court or judge at such time and place as the court or judge may direct; and shall cause to appear at said time and place, one or more respectable physicians who shall state under oath in writing, their opinion of the case, which opinion shall be carefully preserved and filed with the other papers in the case; and if the said physician or physicians shall certify to the insanity or idiocy of said person, and it appear to the satisfaction of the court or judge that such is the fact, said court or judge shall cause such insane or idiotic person to be taken to and placed in the hospital for the insane in Washington territory[5]: *Provided*, That such person or any person in his behalf, may demand a jury to decide upon the

---

[5] This period of commitment was indefinite and was limited by only the notification of the probate court to improvement in the committed person's condition: "Whenever the court shall receive information that such ward has recovered his reason, he shall immediately inquire into the facts, and if he finds that such ward is of sound mind, he shall forthwith discharge such person from care and custody." CODE of 1881, ch. 110, § 1652, at 279.

question of his insanity, and the court or judge shall discharge such person if the verdict of the jury is that he is not insane.

CODE OF 1881, ch. 110, § 1632, at 277.

The plain text of § 1632 makes clear that the jury trial right attached to the trial before the probate court at which the question of the person's insanity was decided. The statute provided for a single contested trial, envisioning one proceeding in which witnesses—"one or more respectable physicians"—were called to evaluate and testify as to the person's insanity. If found insane, the person was committed to the "hospital for the insane" for an indefinite period. It was to this type of proceeding that the jury trial right attached.

A probable cause hearing held pursuant to RCW 71.05.240 is not a proceeding of the same type. Its differences will be discussed below.

Moreover, at its core, S.E.'s contention is that—in territorial days—no person could suffer a loss of liberty without first having a jury decide the facts necessary to justify such a commitment. But S.E. does not prove this to be so. And history belies the contention.

E

S.E. next asserts that, in territorial days, the right to a jury trial attached to any proceeding akin to the probable cause hearing referenced in RCW 71.05.240. She does not prove this to be so.

In fact, our review of the relevant statutes and cases reveals no indication that a jury trial was required before a person accused of insanity could be detained for up to 17 days. Indeed, there was no territorial proceeding akin to the probable cause hearing provided for in RCW 71.05.240.

1

The second inquiry necessary to determine whether the constitutional jury right applies is whether the action at issue is similar to one that included a jury trial right in 1889. M.W., 185 Wn.2d at 662. This "inquiry is not whether the specific cause of action existed in 1889, but rather whether the type of action is analogous to one available at that time." Endicott, 167 Wn.2d at 884 (citing Sofie, 112 Wn.2d at 648-49).

The challenged statute reads, in pertinent part:

**Petition for involuntary treatment or alternative treatment–Probable cause hearing.** . . . (1) If a petition is filed for fourteen day involuntary treatment . . . , the court shall hold a probable cause hearing within seventy-two hours of the initial detention or involuntary outpatient evaluation of such person as determined in RCW 71.05.180.[6] . . .

> . . . .
>
> (3) At the conclusion of the probable cause hearing:
> (a) If the court finds by a preponderance of the evidence that such person, as the result of mental disorder, presents a likelihood of serious harm, or is gravely disabled . . . , the court shall order that such person be detained for involuntary treatment not to exceed fourteen days.

RCW 71.05.240.

The probable cause hearing is an adversarial proceeding at which the party seeking the commitment of another must present a preponderance of the evidence to support its petition. No right to a jury trial is provided for either the

---

[6] RCW 71.05.180 reads:
**Detention period for evaluation and treatment.** . . . If the evaluation and treatment facility admits the person, it may detain him or her for evaluation and treatment for a period not to exceed seventy-two hours from the time of acceptance as set forth in RCW 71.05.170. The computation of such seventy-two hour period shall exclude Saturdays, Sundays and holidays.

initial 72-hour detention period or the 14-day commitment period.[7] RCW 71.05.150, .240(4). A superior court judge determines whether the petition requesting commitment is properly supported. RCW 71.05.150(2)(a), .240(3)(a). When a petition is filed requesting further commitment for treatment beyond the first 17 days of detention—the 14-day period following the initial 72-hour period— a right to a jury trial is provided. RCW 71.05.310.

In this way, the probable cause hearing set forth by RCW 71.05.240 features an adversarial proceeding wherein a judge—rather than a jury—decides whether, by a preponderance of the evidence, a person's mental illness justifies a cumulative detention period of up to 17 days.

S.E. must therefore prove that—in 1889—a jury trial right was provided in a proceeding akin to the probable cause hearing set forth in RCW 71.05.240.

## 2

There is no indication in our territorial or early statehood authority that a jury was required to decide whether a person's suspected insanity justified detaining the person for up to 17 days. In fact, available authority suggests that, in 1889, persons suspected of suffering from insanity were often subject to being detained without prior jury authorization for up to 60 days or more.

---

[7] S.E. is not challenging RCW 71.05.150, which authorizes a licensed physician to request an order from the superior court to confine an individual for up to 72 hours to allow for examination and preliminary treatment. However, S.E.'s argument, that in territorial days *any* such period of commitment had to be preceded by a jury trial, necessarily applies to this 72-hour period as well.

i

As mentioned, the territorial probate court was accorded jurisdiction over civil proceedings concerning persons suspected of insanity. CODE OF 1881, ch. 110, § 1632, at 277. The jury trial right attached to the proceeding set forth in § 1632—the insanity trial. The trial on the person's insanity occurred when the territorial probate court convened in open court.[8] In 1889, the probate court convened every 60 days. CODE OF 1881, ch. 95, § 1301, at 232.

Prior to the insanity trial, the person was subject to being detained upon a determination by the probate court—rather than a jury. We can see that this was so given that a prerequisite for the insanity trial was a determination by the probate court that the person named in the petition, "by reason of insanity is unsafe to be at large, or is suffering under mental derangement." CODE OF 1881, ch. 110, § 1632, at 277. In addition, the Code of 1881 authorized the probate court to act as a conservator of the peace with authority to arrest and detain persons who were suspected of being dangerously insane. CODE OF 1881, ch. 95, § 1309, at 233. This authority included the authority to cause a peace officer to detain the individual.[9]

---

[8] The probate court had authority to "cause [the person named in the commitment petition] to be brought before said court or judge at such time and place as the court or judge may direct." CODE OF 1881, ch. 110, § 1632, at 277. Given that the insanity trial involved witnesses and, if demanded, a jury, we logically infer that the probate court would set the insanity trial for a time when the court was in session. Indeed, S.E. does not attempt to establish otherwise.

[9] Our Supreme Court has acknowledged that a peace officer's "authority to restrain a dangerously insane person . . . appears to have existed at common law." Plancich v. Williamson, 57 Wn.2d 367, 369, 357 P.2d 693 (1960) (citing In re Allen, 82 Vt. 365, 73 Atl. 1078 (1909) (citing Porter v. Ritch, 70 Conn. 235, 39 L.R.A. 353 (1898); Keleher v. Putnam, 60 N.H. 30 (1880); Look v. Dean, 108 Mass. 116 (1871); Colby v. Jackson, 12 N.H. 526 (1842))). The Code of 1881 authorized the probate court to act as "a conservator of the peace throughout his county." Code of 1881, ch. 95, § 1309, at 233. In defining "conservator of the peace," Black's Law Dictionary references an entry which reads:

But nowhere do these provisions suggest that—in 1889—there was provided a right to have a jury determine whether the facts alleged in the commitment petition justified an insanity trial or whether the person should be involuntarily detained as part of being "caused" to appear before the court at the time of trial. Rather, the territorial statutes suggest that, in 1889, a person accused of insanity could be detained for at least 60 days without first having a jury decide whether the deprivation of liberty was justified. S.E. makes no attempt to prove otherwise.

ii

Enactments by our legislature from early statehood reinforce this view. In 1915, the state legislature passed a bill regulating the preliminary commitment period for observation of a person charged with insanity. The law read, in pertinent part:

> PRELIMINARY COMMITMENT AND OBSERVATION OF
> PERSONS CHARGED WITH INSANITY.
>
> AN ACT relating to the insane, their preliminary care and commitment, and providing for an observation detention ward in county hospitals.
>
> *Be it enacted by the Legislature of the State of Washington:*
>
> SECTION 1. There shall be set aside in each county in the State of Washington having a county hospital, such portions of such hospital as may be necessary for observation detention wards for

---

**peace officer.** (18c) A civil officer (such as a sheriff or police officer) appointed to maintain public tranquility and order; esp., a person designated by public authority to keep the peace and arrest persons guilty or suspected of crime. • This term may also include a judge who hears criminal cases or another public official (such as a mayor) who may be statutorily designated as a peace officer for limited purposes. — Also termed *officer of the peace; conservator of the peace.*

BLACK'S LAW DICTIONARY 1311 (10th ed. 2014).

Furthermore, the text of § 1632 also suggests that the person named in the petition was subject to being detained until the insanity trial. This section authorized the probate court to "cause such person to be brought" before it for the insanity trial. This provision clearly envisioned the potential involuntary nature of the person's appearance.

> those charged with insanity, and in each such hospital there shall be separate detention wards for males and females, and *any judge of the superior court*[10] *of the State of Washington before whom a person is charged with insanity may order the sheriff arresting said person to forthwith commit such person to said observation detention ward for a period not to exceed thirty (30) days*, except as hereinafter provided: . . . Said detention wards shall be under the supervision and control of the county physician of the county in which situated, who shall make careful observation of the patients under his charge and testify at the trial of the patient as to such observation, and *should said physician require longer time for observation of said patient than thirty days, he shall make application to the court for an extension of time of not more than thirty days.*

LAWS OF 1915, ch. 105, § 1, at 303-04 (emphasis added); see also REM. COMP. STAT. § 6931. Pursuant to this statute, the superior court was authorized to commit a person charged with insanity to a "detention ward" for a period not to exceed 60 days—30 days plus an additional 30 days, if requested. The statute did not provide a right to demand a jury trial. Thus, 26 years after statehood, the 1915 legislature did not require that a jury determine whether a person's suspected insanity justified up to 60 days of detention.

In 1951, nearly four decades later, the legislature repealed the 1915 provision and enacted a similar provision in its place, which read:

> There shall be set aside in each county of the state of Washington having a county hospital, such portions of such hospital as may be necessary for the detention and observation of those persons detained under the provisions of this act pending further proceedings. In each such hospital there shall be separate detention wards for males and females. *The superior court may*

---

[10] Upon statehood, and after probate judges' terms of office expired, the state constitution vested the superior court with probate jurisdiction and abolished the probate court. CONST. art. XXVII, § 10; Ball v. Clothier, 34 Wash. 299, 308, 75 P. 1099 (1904). "In order that no inconvenience may arise by reason of a change from a Territorial to a State government," CONST. art. XXVII, the superior court was to "proceed to final judgment or decree, order or other determination in the several matters and causes, as the territorial probate court might have done, if this Constitution had not been adopted." CONST. art. XXVII, § 10.

*order the examination of such persons by medical personnel for the purpose of obtaining testimony as to the alleged mentally ill person's condition. Such observation period shall not exceed sixty days unless a jury trial has been demanded.*[11]

LAWS OF 1951, ch. 139, § 28, at 350 (emphasis added). This provision, like its predecessor, set forth a preliminary period of detention of up to 60 days. This provision, too, did not provide for a jury to decide whether a person's suspected insanity justified the 60-day detention period.

Thus, the 1915 and 1951 legislatures each enacted a law authorizing a person charged with insanity to be detained for up to 60 days without also providing for a jury to decide whether the detention was justified. This suggests that such detention, without jury involvement, upon a suspicion of insanity was considered to be consistent with historical practice. S.E. offers no historical perspective to the contrary.

iii

Furthermore, a 1945 opinion by our Supreme Court is instructive on the question of whether—in 1889—a jury was required to decide whether a person's suspected insanity justified a pretrial period of detention. In In re Ellern, the factual exposition read, in part:

> The material allegations of the petition, in so far as are necessary for a determination of the case, are that *on February 15, 1944, the petitioner was taken into custody by reason of a complaint made against him by his wife*, Bernice Ellern, charging him with being an insane person and dangerous to be at large; that his attorney made and filed a demand in writing that the question of his insanity be determined by a jury; that this demand was ignored by the trial

---

[11] Our Supreme Court interpreted this provision to permit "detention beyond 60 days where a jury trial has been demanded." In re Levias, 83 Wn.2d 253, 258, 517 P.2d 588 (1973) (citing former RCW 71.02.130 (1959)), overruled on other grounds by Dunner v. McLaughlin, 100 Wn.2d 832, 676 P.2d 444 (1984).

- 14 -

judge; that he was not present when the hearing was had to determine his mental condition; *that on July 11, 1944, he was declared by the superior court of Washington for Pierce county to be sane and not dangerous to be at large*, and was discharged from custody.

23 Wn.2d at 221 (emphasis added). These facts show that Ellern was charged with insanity and subsequently detained for almost five months. Ellern, 23 Wn.2d at 221.

If, at statehood, a jury decision was constitutionally required before a person suspected of insanity could be subject to pretrial detention, there is a curious absence of objection or reference to this constitutional right in an opinion filed 55 years after statehood and 72 years prior to today.

It is notable that our Supreme Court, at a time so much closer to initial statehood and in an opinion concerning the jury trial right in insanity proceedings, did not find significant that Ellern was detained, without jury approval, while awaiting trial upon a charge of insanity. This suggests that such detention was consistent with historical practice. And, more to the point, S.E. does not prove otherwise.

iv

S.E. fails to prove that—in 1889—a person suspected of insanity could not be detained while awaiting trial on the sanity question. Instead, the territorial and early statehood authority suggest that, without a jury's decision regarding whether such detention was justified, a person suspected of suffering from insanity could be detained for up to 60 days without controversy.

3

Next, S.E. must prove that there was a proceeding in 1889 akin to the probable cause hearing set forth in RCW 71.05.240. S.E. does not prove this to be so.

As described above, § 1632 of the Code of 1881 set forth a proceeding for a person suspected of insanity in 1889. This statute authorized the territorial probate court, upon its satisfaction of the facts alleged in the commitment petition, to order an insanity trial. CODE OF 1881, ch. 110, § 1632, at 277. As analyzed herein, the probate court also had authority to order that the person be detained until the trial. CODE OF 1881, ch. 95, § 1309, at 233; CODE OF 1881, ch. 110, § 1632, at 277. A jury trial right was provided for the insanity trial and one or more physician witnesses were required to attend and testify. CODE OF 1881, ch. 110, § 1632, at 277. Section 1632 mentioned neither a proceeding referenced as a probable cause hearing nor any other adversarial proceeding occurring before the insanity trial.

From 1889 to 1973, commitment proceeding legislation retained many of the features established at law in 1889. The legislature continued to authorize the superior court to review commitment petitions and order an insanity trial. LAWS OF 1959, ch. 25, § 71.02.090, at 81-82; LAWS OF 1951, ch. 139, § 17, at 346-47; LAWS OF 1889-90 § 16, at 486. The legislature repeatedly authorized the superior court to detain persons suspected of insanity for up to 60 days prior to trial. LAWS OF 1959, ch. 25, § 71.02.120, .130, at 82-83; LAWS OF 1951, ch. 139, §§ 18, 28, at 347, 350; LAWS OF 1915, ch. 105, §1, at 303-04; CONST. art.

XXVII, § 10.[12] The legislature provided for a right to demand a jury for the insanity trial. LAWS OF 1959, ch. 25, § 71.02.210, at 86; LAWS OF 1951, ch. 139, § 23, at 348; LAWS OF 1889-90, § 16, at 486. And the legislature consistently provided for physicians as witnesses at the trial. LAWS OF 1959, ch. 25, § 71.02.170, at 85; LAWS OF 1951, ch. 139, § 21, at 348; LAWS OF 1889-90, § 16, at 486.

In 1973, our legislature enacted a new statutory scheme for commitment proceedings. The legislature's hope was to "prevent inappropriate, indefinite commitment of mentally disordered persons." RCW 71.05.010(1)(b). The 1973 statutory scheme adopted some features of the earlier commitment statutes but sought to provide greater protections to those accused of suffering from a dangerous mental illness.

Significantly, the legislature provided for an adversarial proceeding, referenced as a probable cause hearing, to result upon a petition for commitment for treatment for 14 days. RCW 71.05.230, .240. As discussed, the petitioner was required to meet a burden of proof at the probable cause hearing and show by a preponderance of the evidence that person named in the petition was dangerously mentally ill, pursuant to RCW 71.05.240.

This probable cause hearing was a novel addition to Washington's commitment procedure. There is no indication that, in 1889, prior to the insanity

---

[12] In 1951, the legislature explicitly codified the longstanding authority of the court to "issue an order of apprehension directing that the alleged mentally ill person be immediately apprehended and detained pending hearing and examination." LAWS OF 1951, ch. 139, § 18, at 347. The law set forth that "[t]he sheriff or other person as designated by the court, shall execute the order of apprehension." LAWS OF 1951, ch. 139, § 18, at 347.

trial, there had been any adversarial proceeding which placed a burden of proof on the petitioner in response to a petition for short-term commitment. Indeed, as mentioned, the territorial statutes suggest that the procedure for commitment included a nonadversarial judicial review of the facts alleged in the commitment petition, a nonadversarial judicial determination that the person should be detained pending trial, and a later insanity trial (to which the jury trial right attached). Clearly, none of these territorial procedures contained features analogous to those of the probable cause hearing referenced in RCW 71.05.240, an adversarial proceeding with a specified burden of proof.

Thus, S.E. does not prove that a proceeding existed in 1889 akin to the probable cause hearing set forth in RCW 71.05.240.[13]

4

Finally, as a practical matter, S.E.'s contention that—in 1889—jury trials on the sanity question must have been held within three days of initial detention[14] is plainly implausible. Ninety years ago, our Supreme Court acknowledged the travel conditions and described the effort exerted to travel to the seat of government in territorial days:

> The framers of the constitution must have had in mind the
> conditions which then existed. This was then a territory about to be
> admitted into the sisterhood of the states. It was traversed from

---

[13] S.E. relies on Sherwin, 96 Wn.2d 77, Quesnell, 83 Wn.2d 224, and Ellern, 23 Wn.2d 219, to support her assertion. Her reliance is unavailing. These opinions dealt with matters utterly unrelated to the question of whether a jury must be seated for the probable cause hearing referenced in RCW 71.05.240. Sherwin, 96 Wn.2d at 83-84 (whether § 1632 preserved a constitutional right to venue); Quesnell, 83 Wn.2d at 240 (whether guardian ad litem had authority to waive jury trial right); Ellern, 23 Wn.2d at 224 (whether trial court erred by ignoring jury trial demand for insanity trial).

[14] S.E. contends that a jury trial must commence within 72 hours in 2017. Thus, logically, S.E. must contend that such jury trials commenced within 72 hours in 1889.

- 18 -

east to west by but one line of railroad. Many . . . coming from the northeasterly and the southeasterly portions of the new state might and would have to travel many miles by stage or private conveyance before they could reach a line of railway, and then perhaps four hundred or more miles of railway travel to reach the seat of government. Days would be consumed in the journey.

State v. Clausen, 142 Wash. 450, 455, 253 P. 805 (1927).

Similarly, the framers of our constitution must have had in mind the conditions that existed regarding the practical exercise of the jury trial right in 1889. These conditions plainly were not conducive to the rapid conveyance of physician witnesses and jurors. In 1889, even when no jury trial was demanded, abundant notice and travel time were likely required simply to arrange for an insanity trial to take place. Further, when a jury trial was demanded, even greater coordination and advance preparation would be required, this time to garner 12 men to sit as jurors—even more so during planting or harvesting season or in far-flung, sparsely populated rural counties throughout the territory.

S.E. does not attempt to show that, given the territorial travel conditions, it was so that jurors were seated within 72 hours of a person's detention so that they could decide whether a person's suspected insanity justified keeping the person in continued detention. Our study of relevant authority reveals no suggestion that this was historically so.

5

Thus, there was no proceeding in 1889 to which the jury trial right attached akin to the proceeding referenced as a probable cause hearing in RCW 71.05.240. Accordingly, the Washington Constitution does not require that a jury

be seated to determine the issues presented in a probable cause hearing commenced pursuant to RCW 71.05.240.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions. See RCW 2.06.040.

## III

S.E. next contends that the trial court erred by granting the petition to commit her for an additional 14 days of evaluation and treatment. This is so, she asserts, because substantial evidence does not support the trial court's determination that (1) she presents a significant likelihood of serious harm to others and (2) she suffers from a grave disability. We disagree.

## A

S.E. was living at the Downtown Emergency Services Center (DESC), a facility providing shelter and supportive services to homeless people. In January of 2016, S.E. began to meet with a new case manager, Kiley Huntington. At the outset, S.E. was excited to meet with Huntington. When they met, S.E. ably explained her interests and personal story to him.

Chris Heath, who was also a case worker at the DESC, was familiar with S.E., having seen her around the DESC several times per week during the previous year and a half. Heath regarded S.E. as someone who was able to engage with the DESC's staff and work through her issues.

Huntington and S.E. continued to meet over the course of the month of January. They saw each other every week, sometimes a few times per week.

Over time, Huntington noticed that his interactions with S.E. were becoming more difficult. S.E. told him that other residents at the DESC were treating her poorly and stealing her possessions. Huntington felt "like there was a bit of a disconnect," and that S.E. was becoming more evasive and elusive. Near the end of the month, S.E. expressed a desire to not be around a large number of people and moved her possessions from the DESC's dayroom area to the DESC's front lobby.

On January 28, Huntington stopped by the DESC for reasons unrelated to his work with S.E. S.E. saw Huntington in the front lobby and she engaged him in conversation. She began to tell him about her troubles at the facility with the other residents. While they were talking, a man who was visibly distressed and screaming entered the DESC. The man's demeanor caused S.E. to stand up out of her chair but, when he left the lobby area, S.E. sat back down. As S.E. and Huntington continued talking, however, the man returned, renewed his screaming, and exhibited visible distress.

Again, S.E. stood up out of her chair. This time, however, S.E. said that the man "was her crisis" and she began screaming and aggressively moving her hands toward Huntington's face. S.E.'s hands did not make contact with Huntington's body but her hands came within inches of his face. In response to S.E.'s frantic movements and demeanor, Huntington became concerned for his safety and began to back away from S.E. He retreated down a stairwell and exited the building.

Heath was also at the DESC at the time of this incident. He saw S.E. charge toward Huntington and clap her hands at him. In an attempt to redirect S.E.'s attention away from Huntington, Heath went into the lobby office and called out to S.E. from behind a small glass window. S.E.'s demeanor was still frantic. She began shouting racial epithets and, with a blanket in her hand, threatened that if "someone glanced at her the wrong way she would hit them with her blanket." At the time, Health felt scared because he did not know what S.E. was capable of and because he had not seen this kind of behavior from her in the past.

Heath continued to attempt to talk to S.E. from behind the window but S.E. became even more agitated. Then, at a moment when Heath was not directly protected by the window, S.E. moved her hand that was holding the blanket toward Heath. S.E.'s hand made contact with Heath's face. Heath, then fearing for his safety, withdrew from the lobby office area.

Thereafter, S.E. was taken to Fairfax Hospital for an initial three-day period of mental evaluation and treatment. Upon her arrival, it was discovered that she suffered from an extensive infestation of lice on her head and body, for which she was promptly treated. While there, S.E. was very vocal, had an angry demeanor, and suffered from delusional thoughts, hallucinations, and impaired judgment and insight. She was observed and evaluated by Dr. Angel Lugo-Steidel. Dr. Lugo-Steidel formed a working diagnosis that S.E. suffered from schizophrenia.

A physician from Fairfax Hospital filed a petition to confine S.E. for an additional 14 days of evaluation and treatment. At the resulting hearing, the State presented the testimony of Huntington and Heath, who spoke to the incident at the DESC. The State also presented the testimony of Dr. Lugo-Steidel, who opined that, based on his observation of S.E., his review of her medical chart notes, and the testimony presented by Huntington and Heath, S.E. presented a substantial risk of physical harm to others and was gravely disabled. S.E. testified in opposition to the 14-day commitment petition. The trial court granted the petition.

B

When the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the trial court's findings of fact and, if so, whether the findings in turn support the trial court's conclusions of law and the judgment. In re Det. of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). "Substantial evidence is 'evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.'" In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998) (quoting Holland v. Boeing Co., 90 Wn.2d 384, 390, 583 P.2d 621 (1978)), aff'd, 138 Wn.2d 898, 982 P.2d 1156 (1999). "The party challenging a finding of fact bears the burden of demonstrating the finding is not supported by substantial evidence." A.S., 91 Wn. App. at 162 (citing Nordstrom Credit, Inc. v. Dep't of Revenue, 120 Wn.2d 935, 939-40, 845 P.2d 1331 (1993)).

This court defers "to the trier of fact on the persuasiveness of the evidence, witness credibility, and conflicting testimony." In re Vulnerable Adult Petition for Knight, 178 Wn. App. 929, 937, 317 P.3d 1068 (2014) (citing Morse v. Antonellis, 149 Wn.2d 572, 574, 70 P.3d 125 (2003); Burnside v. Simpson Paper Co., 123 Wn.2d 93, 108, 864 P.2d 937 (1994)).

1

S.E. contends that substantial evidence does not support the trial court's findings of fact underlying its conclusion that S.E., as a result of her mental disorder, presented a substantial risk of serious physical harm to others. We disagree.

Here, the trial court found that:

a. On January 28, 2016, the Respondent swung her fist at and barely missed striking in the face Mr. Huntington, one of her case managers at the Downtown Emergency Service Center. The Respondent had no reasonable grounds to attempt to strike Mr. Huntington.
b. On January 28, 2016, during the same incident, the Respondent struck in the face another one of her case managers, Mr. Heath. The Respondent had no reasonable grounds to strike Mr. Huntington [sic].
c. Both Mr. Huntington and Mr. Heath were reasonably afraid for their safety on during [sic] the incident on January 28, 2016.
d. The Respondent has continued to be threatening in various degrees to the staff at the hospital.
e. If discharged the Respondent would pose a risk of assaulting other people.

The trial court concluded that the State proved "by a preponderance of the evidence that [S.E.], as the result of a mental disorder, presents a likelihood of serious harm to others, as that term is defined in RCW 71.05.020(27)(a)(ii)."

- 24 -

The trial court's findings are supported by substantial evidence. Huntington testified that, on January 28, S.E. had swung her hands near his face in an unanticipated outburst. He further testified that S.E.'s behavior and demeanor placed him in fear that he would be harmed or that she would harm others. Huntington testified that he was

> shocked at how quickly [S.E.] became aggressive. I hadn't experienced that from [S.E.] before. Every other time we had met, we had been able to speak, and there wasn't ever that aggression -- physical aggression. So I was very concerned at how quickly she became agitated just from, you know, speaking like normal until the point where she was swinging at me. There weren't any, like, real warning signs of that escalation. It was just zero to 100.

Heath, for his part, testified that S.E. had struck him in the face after her incident with Huntington. Health testified that he "was worried that she was going to continue the assault. I was worried that other staff members may become victims of any kind of assault. I was definitely worried for my safety."

Dr. Lugo-Steidel testified that he had observed S.E. in the hospital during her initial period of evaluation and treatment, read her medical chart notes from that time, and listened to the testimony of Huntington and Heath describing S.E.'s conduct. Dr. Lugo-Steidel testified that, while observing S.E. during her initial evaluation and treatment period, S.E. remained very vocal and retained an angry demeanor.

Dr. Lugo-Steidel further testified to S.E.'s medical chart notes from the evaluation and treatment period at the hospital. He testified that the chart notes described S.E. as appearing angry and easily agitated, having delusional,

- 25 -

illogical, and confused thoughts,[15] suffering from hallucinations of "crawling," showing poor hygiene and grooming habits,[16] and appearing to engage in conversations resulting from internal stimuli. Dr. Lugo-Steidel testified that the chart notes indicated that there was an urgent need for antipsychotic or mood stabilizer medication and that S.E. was refusing to take any medication.

Drawing from these sources, Dr. Lugo-Steidel opined that S.E. suffered from schizophrenia and presented a risk of physical harm to others: "[I]n my expert opinion she would be a significant danger to others. If she were to return to that shelter, the likelihood that she would try to assault somebody, in my opinion, is high."[17] The trial court determined that the testimony of Huntington, Heath, and Dr. Lugo-Steidel was credible.

This evidence supports that S.E., through her behavior, had actually caused physical harm to Heath, placed both Huntington and Heath in reasonable fear that she would inflict serious physical harm upon them, and posed a risk of serious physical harm to others. Thus, the findings of fact support the trial court's conclusion that S.E. presented a substantial risk of serious physical harm to others. There was no error.

---

[15] A note from her medical charts detailed that S.E. identified the scabs on her body as "skittles" and that she needed to keep the scabs in a cup for "proof."

[16] S.E. repeatedly refused to shower, despite the hospital staff's prompting, over the course of her initial treatment period.

[17] S.E. testified that she had indeed clapped her hands near Huntington's face but said that she did so as a way of conveying to Huntington the importance of what she had to say to him. S.E. denied hitting Heath in the face.

2

S.E. next contends that substantial evidence does not support the trial court's findings of fact underlying its conclusion that S.E., as a result of her mental disorder, was gravely disabled. We disagree.

A condition renders a person "gravely disabled" pursuant to subsection (b) of RCW 71.05.020(17) when, as a result of a mental disorder, the person "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." To establish that a person is gravely disabled as defined in subsection (b), the State has the burden to present recent proof of significant loss of cognitive or volitional control. A.S., 91 Wn. App. at 164 (citing LaBelle, 107 Wn.2d at 208). "The evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, the care *essential* for his or her health or safety." A.S., 91 Wn. App. at 164 (citing LaBelle, 107 Wn.2d at 208).

Here, the trial court found,

> based on the testimony of Mr. Heath and Mr. Huntington that: (a) at an earlier time [S.E.] was much more reasonable and was able to act rationally and carry on conversations in a rational way; (b) recently there has been severe deterioration in the Respondent's routine functioning and repeated and escalating loss of her cognitive and volitional control over her actions, as evidenced by the facts that she is now irritable, aggressive and suffering from hallucinations; (c) outside the hospital she has not received, and if released from the hospital she would not receive such care as is essential for her health or safety; (d) she currently is unable to care for her health or safety needs, or make rational decisions as to her activities of daily living; and (e) if discharged from the hospital, it is more likely than not that she would assault other people.

. . . The court finds that it is essential that the Respondent remain in the Petitioner's hospital for inpatient treatment because she would not be able to receive the care she needs if she were to leave the hospital at this time. The Respondent is struggling and currently cannot care for herself, including caring for her activities of daily living. The Respondent has little or no insight into her mental disorder, or her need for treatment for her mental disorder. She has not volunteered to undergo treatment for her mental disorder.

The court concluded that, as a result of her mental disorder, S.E. was gravely disabled as defined by RCW 71.05.020(17)(b).

Substantial evidence supports the trial court's findings. Both Huntington and Heath testified that S.E.'s demeanor had radically and suddenly changed. Huntington testified that, at the outset of their relationship, S.E. was eager to speak with him and communication between them flowed easily. Heath testified that he believed that S.E. was able to engage with her case managers and work through her personal problems.

Notably, Huntington further testified that, over the course of their weekly meetings, S.E. became more difficult and evasive. He testified that S.E.'s demeanor changed entirely on January 28 when, for the first time, she became unexpectedly vocal and physically aggressive toward him. Heath, like Huntington, testified that he was surprised when, after the incident with Huntington, S.E. became physically and vocally aggressive toward him, culminating with her hand actually making physical contact with his face.

In addition, Dr. Lugo-Steidel testified that, when S.E. was outside of the hospital context, she was not receiving care that was essential for her health. This was so, he testified, because S.E. was found covered in a significant number of lice when she arrived at Fairfax, she did not appear to be able to take

- 28 -

care of her own activities of daily living—including showering and going to the bathroom—and she did not appear to recognize that she needed to receive medical treatment.

This evidence substantially supports the finding that S.E. suffered a recent and significant loss of cognitive or volitional control over her actions and that she would not receive the necessary care if she were released from the hospital. The findings of fact support the trial court's conclusion that S.E., due to her mental disorder, was gravely disabled. The trial court did not err.

Affirmed.

_____

We concur:

_____          _____
Trickey, A.C.J.                      Becker, J.