IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Detention of B.F. | ) ) ) | No. 80825-7-I |
| STATE OF WASHINGTON, | ) ) | DIVISION ONE |
| Respondent, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| B.F., | ) ) | |
| Appellant. | ) ) | |

BOWMAN, J. — B.F. appeals his 14-day involuntary commitment for mental health treatment under RCW 71.05.020(22)(b),[1] arguing insufficient evidence supports the court's finding that he was "gravely disabled" and the court deprived him of his constitutional right to a jury trial. We affirm.

## FACTS

B.F. worked as a delivery driver for United Parcel Service (UPS) for over 20 years. In summer 2019, B.F. began suspecting people were following him on his delivery route. At first, B.F. thought that UPS assigned a "safety team" to follow him, but his boss denied it. Then B.F. wondered if an insurance company investigator was watching him to gather evidence in a pending injury claim. His

---

[1] Unless otherwise noted, all citations to chapter 71.05 RCW throughout this opinion are to the former statutes in effect in 2019.

Citations and pin cites are based on the Westlaw online version of the cited material.

sister, an attorney, inquired and learned that the insurance company was not following B.F.

Despite his sister's reassurances, B.F. continued to believe that people and cars were following him. During a shift in late August, B.F. became so concerned and distracted by thoughts of being followed that he called his boss and asked to be taken off the road. B.F. then took medical leave from his job to figure out what was happening to him. Soon after taking leave, B.F. was unable to pay rent on his new apartment. The manager evicted him and he began living in his car.

Over the next few months, his family members saw a decline in his behavior and appearance. B.F.'s brother-in-law Terran[2] noticed "significant changes" in B.F. in September and October. B.F. had always been committed to his job, exercised, and took care of his mother. But B.F. became paranoid and delusional over the summer and fall. B.F.'s eating habits changed and he lost 30 to 40 pounds. His hygiene began to suffer and he looked "disheveled." According to Terran, B.F. was once "somebody who cares a lot about his appearance. He always makes sure that he is . . . well-groomed . . . . He's always put together very well and just lately he stinks."

Terran testified that B.F. seemed "scattered" and "ramble[d] on sometimes incoherently." He described B.F.'s increasing paranoia:

> When he left work, he said that he was being followed by a couple
> of people, and that has since escalated. He said six people [were]
> following him, then it was 18 people. Now he is indicating that he

---

[2] We use only the first names of B.F.'s family members to protect his identity.

> believes that airplanes are following him, that . . . people walk by with dogs, if a dog barks, he thinks those people are being sent to watch him. If anybody coughs, he believes those people are being sent to watch him. Just extreme, extremely strange behavior that has been concerning.

B.F. also began making concerning statements that he would have to kill himself or someone else. In October, he brandished a large hunting knife and told Terran that "somebody is going to die today, I'm going to have to kill somebody because I'm going to protect myself."

B.F.'s sister Blen said that B.F. became "very panicky and very erratic" starting late summer and that he recently lost a lot of weight and stopped showering. She became very concerned in late October when B.F. told her that "the knife that he has is not good enough. . . . [T]hey are attacking him now and he has to protect himself and he is going to purchase a gun." He also said, "[I]t is going to be them or me." Blen was very worried that B.F. would attack and hurt someone.

On October 28, 2019, B.F.'s family called 911 due to his increasing paranoia. Police took B.F. to the Valley Medical Center Emergency Department for a mental health evaluation. At the emergency room, B.F. "present[ed] with paranoia; believing cars/people/airplanes and drones are following him." He displayed "fast and pressured" speech and "racing thoughts." The State petitioned to detain B.F. for involuntary mental health treatment, stating that B.F. presented "as an imminent risk of serious harm to himself, to others, and as gravely disabled due to his paranoid delusions, obsessions and impaired judgment."

After an initial 72-hour detention, the State petitioned to detain B.F. for up to an additional 14 days of involuntary inpatient treatment, alleging that B.F. was suffering from a mental disorder resulting in a likelihood of serious harm to himself or others and that he was gravely disabled. The State alleged that B.F. remained symptomatic and required more inpatient treatment in a psychiatric hospital "to stabilize his functioning through pharmacological and psychotherapeutic interventions."

A court commissioner held a probable cause hearing, taking testimony from Terran, Blen, and B.F. Clinical psychologist Dr. Robert Beatty also testified at the hearing. Dr. Beatty concluded that B.F. had a "working diagnosis" of "bipolar one, most recent episode manic, with psychotic features." Dr. Beatty testified:

> [B.F.] was pretty clearly manic when he was brought into the emergency department. The decreased sleep, the hyper vigilance. There was also the psychotic part of it, the delusions, and probably hallucinations. He saw people following him around. So it is not just he believed they were following him around, but he actually saw people following him. He saw cars following him.

Dr. Beatty explained that B.F. was making decisions based on delusions of people following him, including carrying a knife, thinking about getting other forms of protection, and changing the way he drove. According to Dr. Beatty, B.F. was responding well to treatment with a mood stabilizer and an antipsychotic medication since admitted to the hospital. B.F. no longer saw people following him but continued to have delusions. Dr. Beatty remained

4

concerned about B.F.'s persistent belief that he was being followed:

> [H]e has that firmly held belief and he is making decisions based off of it, including carrying weapons and attempting to obtain — or intending to obtain more weapons, that is a very dangerous situation, and it is a significant departure from the level of cognitive and volitional ability he demonstrated during his time working for UPS as indicated by both him and the testimony of his family.

Dr. Beatty believed that without further treatment, B.F. was at risk of ongoing paranoid delusions, raising the possibility that "if he is in a less structured setting, he will perceive a passerby to be in on the delusion and use the hunting knife." Dr. Beatty was concerned that "untreated, the symptoms will continue to sort of overwhelm [B.F.'s] ability to cope and adapt to the vagaries of life up to and including providing for food, clothing, and shelter." Dr. Beatty did not recommend less restrictive treatment because he was "sure" that B.F.'s delusions would persist "if he were discharged today," and that "[a]t this point [B.F.] is not able to exercise the sort of executive function necessary to be safe in the community."

B.F. testified that he no longer believed that people are following him. He denied any significant weight loss and attributed his minimal sleep to homelessness. B.F. said he secured housing with a coworker and he planned to return to work at UPS in a role other than delivery driver. He told the court he had an appointment with a psychiatrist, intended to take his bipolar medication, and would return to the hospital if he became concerned about people following him.

The court found that B.F. "has a mental disorder that substantially affects his volitional and cognitive functioning." It concluded that B.F. had "shown a substantial deterioration of functioning." The court stated:

> This was a very high functioning man. He had a responsible job with UPS as a driver. He has a long history of safe driving. And all of a sudden he can't even drive for UPS and finish his route. He is clearly affected and deteriorated. The family describes the deterioration of his eating habits, and he in fact admits the deterioration in his sleep. He is at the point where his [sic] not able to maintain housing. He is not able to get adequate sleep, but he has trouble [indiscernible] because he is losing weight.[3]

The commissioner entered findings of fact and conclusions of law following the probable cause hearing. The court noted, "The Respondent has also taken various steps based on these delusions, including taking [medical] leave from his job, losing his housing, obtaining a knife to protect himself and expressing the desire to obtain a gun to protect himself." The court found B.F. presented a safety risk to himself "because he might act" on the delusions that people are following him, endangering himself and others. The court concluded that B.F. needed inpatient treatment because he continued to have symptoms and needed the structure of a hospital to prevent risk to himself or others. The commissioner "found by a preponderance of the evidence" that B.F. was "gravely disabled under prong (b)"[4] and ordered up to 14 days of inpatient treatment.

B.F. moved for revision of the commissioner's decision. A superior court judge denied the motion. B.F. appeals.

---

[3] Second alteration in original.

[4] RCW 71.05.020(22).

6

ANALYSIS

Gravely Disabled

B.F. claims the evidence presented at the probable cause hearing does not support his commitment for treatment. Specifically, B.F. argues the evidence does not establish repeated cycles of deterioration as needed for a finding of "gravely disabled" under RCW 71.05.020(22)(b). The State contends that "evidence of prior hospitalization or police involvement — repeated occurrences of stabilization and treatment —" is not required for involuntary commitment as "gravely disabled" under prong (b) of the statute. We agree with the State.

To commit a person for 14 days of involuntary treatment, the court must hold a probable cause hearing and find

> by a preponderance of the evidence that such person, as the result of a mental disorder . . . , presents a likelihood of serious harm, or is gravely disabled, and, after considering less restrictive alternatives to involuntary detention and treatment, finds that no such alternatives are in the best interests of such person or others.

RCW 71.05.240(3)(a). Because the trial court weighed the evidence, we limit our review to whether substantial evidence supports the court's findings of fact and whether those findings support the conclusions of law and judgment. In re Det. of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986).

Here, the State alleged that B.F. was "gravely disabled" under prong (b) of RCW 71.05.020(22), which provides:

> "Gravely disabled" means a condition in which a person, as a result of a mental disorder, or as a result of the use of alcohol or other psychoactive chemicals: . . . manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

7

To show that a person is "gravely disabled" under RCW 71.05.020(22)(b), the State must provide evidence of severe deterioration of routine functioning, which

> must include recent proof of significant loss of cognitive or volitional control.  In addition, the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety.

LaBelle, 107 Wn.2d at 208.  The State must also show that the individual is "unable, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment."  LaBelle, 107 Wn.2d at 208.

B.F. emphasizes language in LaBelle to argue that prong (b) of the statute defining "gravely disabled"[5] applies to only " 'discharged patients who, after a period of time in the community, drop out of therapy or stop taking their prescribed medication and exhibit rapid deterioration in their ability to function independently.' "  LaBelle, 107 Wn.2d at 207.  According to B.F., the State must prove "repeated loss of control," including "evidence of hospitalizations or police involvement due to repeated 'rapid deterioration,' " to commit him under RCW 71.05.020(22)(b).  But B.F. quotes LaBelle out of context.  The full text to which B.F. refers reads:

> The definition of gravely disabled in RCW 71.05.020[(22)](b) was added by the Legislature in 1979.  It was intended to broaden the scope of the involuntary commitment standards in order to reach those persons in need of treatment for their mental disorders who did not fit within the existing, restrictive statutory criteria.  By incorporating the definition of "decompensation," which is the progressive deterioration of routine functioning supported by

---

[5] LaBelle cites to former RCW 71.05.020(1) (1979), the subsection of the statute defining "gravely disabled" at the time.

> evidence of repeated or escalating loss of cognitive or volitional control of actions, RCW 71.05.020[(22)](b) permits the State to treat involuntarily those discharged patients who, after a period of time in the community, drop out of therapy or stop taking their prescribed medication and exhibit "rapid deterioration in their ability to function independently."

LaBelle, 107 Wn.2d at 205-06[6] (quoting Mary L. Durham & John Q. LaFond, The Empirical Consequences & Policy Implications of Broadening the Statutory Criteria for Civil Commitment, 3 Yale L. & Pol'y Rev. 395, 410 (1985)).

Contrary to B.F.'s assertion, neither RCW 71.05.020(22)(b) nor the relevant case law requires a prior hospitalization as an element for finding a person to be gravely disabled. See In re Det. of D.W., 6 Wn. App. 2d 751, 758-59, 431 P.3d 1035 (2018).[7] Instead, the Labelle court was highlighting a new population of patients served by the expanded scope of involuntary commitment. Indeed, the court affirmed the commitment of two appellants (LaBelle and Trueblood) under RCW 71.05.020(22)(b) with no evidence of repeated hospitalization or loss of control. LaBelle, 107 Wn.2d at 209-10, 214-16. In doing so, it recognized that the trial court need only find that a patient experienced "recent" loss of cognitive or volitional control due to a mental disorder, is unable to make rational choices about treatment, and lacks the

---

[6] Citations omitted.

[7] B.F. argues we should disregard D.W. because the court held that "subsection (b) [of the statute] was proved by ' ["]failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm,["] ' " and that "this was a clear misattribution" of subsection (a) of RCW 71.05.020(22) (a person is gravely disabled under prong (a) if the person is "in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety"). D.W., 6 Wn. App. 2d at 757 (quoting LaBelle, 107 Wn.2d at 204-05). But B.F. conflates the holding of D.W., which clearly addresses the elements of subsection (b). The misattribution to which B.F. refers is in an opening paragraph of the analysis and has no impact on the court's holding. See D.W., 6 Wn. App. 2d at 756-57.

essential care needed for their own health or safety if released. LaBelle, 107 Wn.2d at 208.

Here, the record shows that B.F. was making decisions based on delusions caused by his mental impairment. B.F. carried a knife and mentioned getting a gun to protect himself. He said he would have to kill either himself or someone else. Dr. Beatty expressed concern that B.F. might react violently in response to his delusions. Additionally, B.F. was unable to maintain his job and housing. He lost a significant amount of weight and his personal hygiene declined significantly. Dr. Beatty testified that without further treatment, B.F.'s "symptoms will continue to sort of overwhelm his ability to cope and adapt to the vagaries of life." For these reasons, Dr. Beatty believed B.F. needed the structure of the hospital and further intervention to abate the delusions.

Substantial evidence supports the court's findings and conclusions that B.F. was "gravely disabled" under prong (b) of RCW 71.05.020(22) and required further hospitalization. A less restrictive alternative was not appropriate because substantial evidence established that B.F.'s delusions would persist if the hospital discharged him and that a structured environment was necessary to prevent him from possibly acting on them. We affirm the trial court's order of commitment for up to 14 days of inpatient treatment.

Right to a Jury Trial

B.F. contends that he "was deprived of his constitutional right to trial by jury on a 14-day commitment petition." He argues that the right to a jury trial for involuntary commitment existed at the time of statehood in 1889 and article I,

section 21 of the Washington State Constitution preserves that right. But we rejected B.F.'s argument in In re Detention of S.E., 199 Wn. App. 609, 400 P.3d 1271 (2017), review denied, 189 Wn.2d 1032, 407 P.3d 1152 (2018). After extensive historical analysis, we concluded:

> [T]here was no proceeding in 1889 to which the jury trial right attached akin to the proceeding referenced as a probable cause hearing in RCW 71.05.240. Accordingly, the Washington Constitution does not require that a jury be seated to determine the issues presented in a probable cause hearing commenced pursuant to RCW 71.05.240.

S.E., 199 Wn. App. at 627-28. We decline B.F.'s request to reconsider this decision.

Because sufficient evidence supports the court's finding that B.F. was gravely disabled and he had no right to a jury trial, we affirm the 14-day commitment order.

Bumun, J

WE CONCUR:

Dwyer, J.                    Andrus, A.C.J.