THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Detention of: | ) | No. 81185-1-I |
| | ) | |
| D.O., | ) | DIVISION ONE |
| | ) | |
| Appellant. | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | |

ANDRUS, A.C.J. — D.O. challenges an order finding him gravely disabled under the Involuntary Treatment Act (ITA), RCW 71.05.020(23)(a) and (b) and detaining him for 14 days of involuntary mental health treatment. Because the evidence supports the trial court's findings and D.O. was not entitled to a jury trial at his probable cause hearing, we affirm.

## FACTS

D.O. is a 24-year-old man living with his parents in Hansville, Washington. In late 2019 and early 2020, D.O.'s parents began to notice changes in his behavior. D.O. started saying he was reincarnated and began posting odd things on social media. He told his mother she was "Tinker Bell." He claimed he had a wife and two children living in California, despite the fact he had never been married and has no children, and insisted he needed to get home to his family. He told his parents his wife was named Erica Alonzo,

a friend of his sister's from high school, but when he showed a picture of this "wife" to his parents, they discovered the picture was a model known on social media as "India Love."

At the same time, D.O.'s sleeping and eating habits changed. He was not sleeping or eating and suddenly lost 20 to 25 pounds. D.O. reported he had actually lost 70 pounds over three months. D.O. began making bizarre statements and manifesting delusions, including beliefs that he was reincarnated.

On Sunday, February 9, 2020, D.O. went outside to smoke a cigarette but, unbeknownst to his parents, he disappeared with his mother's car and bank cards. D.O.'s parents reported the car stolen.

The following day, D.O. called his father from Seattle. D.O. denied stealing the car and said he needed to borrow it to go see his wife and children in California. This was the second time D.O. had left to see his imaginary family. According to D.O.'s father, the first time, he left without telling anyone where he was going. He lost his cell phone and was ultimately arrested in Portland, Oregon.

On February 10, D.O. purchased a new cell phone with which he texted his mother to say he had stopped at a hospital in Medford, Oregon because of back pain and breathing problems. Police arrested D.O. in Medford for stealing the car, and after D.O. was released to his father's custody, his parents took D.O. to Harrison Hospital emergency room for help.

A designated crisis responder filed a petition for initial emergency detention on February 12, 2020, and D.O. was detained at Fairfax Hospital. Fairfax filed a petition for 14 days of involuntary treatment on February 18, 2020, alleging D.O. was gravely disabled by a mental disorder. A trial court conducted a probable cause hearing that

same day, taking testimony from D.O.'s parents and a Fairfax licensed mental health counselor, Carmant Desai.

Desai testified he evaluated D.O. and determined that D.O. suffers from a mental impairment and has been diagnosed as suffering from bipolar disorder, manic, with psychotic features. D.O. is delusional, becomes easily agitated and confrontational, makes statements about wanting to hurt people, and shows poor insight and judgment. D.O. reportedly told Fairfax treatment providers that he had images of being raped by relatives and believes he is married to an Instagram model in California and has children with her. D.O. told a physician that he took his mother's car to get help at Providence Hospital for what he described as inflammatory bowel disease. In an interview, D.O. reported three previous suicide attempts, one at the age of 17, when he tried to overdose on Xanax. He also reported trying to swallow toys as a young adolescent and trying to hang himself as a teenager. When asked if he understood why he was in the hospital, D.O. stated he was there because he was "being awkward."

Desai described D.O. as delusional, demanding, confused, unkempt, isolative, and withdrawn. Fairfax treatment records indicated D.O. reported having nightmares of being raped that inhibited his ability to sleep. He believed his brother was evil and this belief led him to have violent and homicidal thoughts. Desai believed D.O. needed to remain hospitalized to ensure D.O. ate and slept properly and received the mental health treatment to reduce his symptoms.

The trial court found by a preponderance of the evidence that D.O., as a result of his mental impairment, was gravely disabled. D.O. appeals.

ANALYSIS

D.O. argues the evidence does not support the trial court's finding that D.O. is gravely disabled. He also contends he was deprived of his constitutional right to have a jury determine whether he had a mental impairment justifying his involuntary commitment for 14 days.

A.    Grave Disability

D.O. maintains the State provided insufficient evidence to prove he was gravely disabled under RCW 71.05.020(23). We disagree.

In order to commit an individual to 14 days of involuntary treatment, the State must demonstrate by a preponderance of the evidence that "such person, as the result of a behavioral health disorder, presents a likelihood of serious harm, or is gravely disabled." RCW 71.05.240(4)(a). RCW 71.05.020(23) defines "gravely disabled" as

> a condition in which a person, as a result of a behavioral health disorder: (a) is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

The trial court found that D.O. is gravely disabled under both prong (a) and prong (b). This court reviews a trial court's findings of fact for substantial evidence, which means a quantum of evidence sufficient to persuade a rational fair-minded person the premise is true. Matter of Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998). The party claiming error has the burden of showing the trial court's finding of fact is not supported by substantial evidence. Id. Under this deferential standard, the appellate court views all evidence and inferences in the light most favorable to the prevailing party, Lewis v. Dep't of Licensing, 157 Wn.2d 446, 468, 139 P.3d 1078 (2006), and there is a presumption in

favor of the trial court's findings.  Matter of Custody of A.T., 11 Wn. App. 2d 156, 162, 451 P.3d 1132 (2019).  If the standard is satisfied, a reviewing court will not substitute its judgment for that of the trial court, which is in a better position to evaluate the credibility of a witness.  Id. at 162.

D.O. contends the evidence does not support a finding of grave disability under prong (a) of the statute because, despite his lack of eating, there was no evidence that his sudden weight loss placed him in danger of serious physical harm.  D.O. argues he could have been overweight or simply chose to lose weight for personal reasons unrelated to his mental impairment.

To show the person is in danger under prong (a), the State must present "recent, tangible evidence of failure or inability to provide for such essential human needs . . . which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded."  In re Det. of LaBelle, 107 Wn.2d 196, 204-05, 728 P.2d 138 (1986).  This standard does not require the substantial risk of harm be evidenced by recent, overt acts such as attempts or threats of harm.  Rather, risk of danger under the grave disability standard typically arises from passive neglect or inaction.  Id. at 204.

The trial court's prong (a) findings are supported by substantial evidence.  First, the evidence was undisputed that D.O. suffers from a mental disorder.  His parents and the State's mental health expert described D.O.'s change in behaviors, his paranoia, delusions, poor boundaries, insight, and judgment, agitation, homicidal ideation, and bizarre statements.

Second, the evidence supports the finding that as a result of this mental disorder, D.O. put himself in danger of serious harm by failing to provide for his own health and

safety. His parents testified that when D.O. is well, he is able to hold a job and maintain regular sleeping and eating habits. He was able to help around the house after work, cook dinner, and walk the family dogs on occasion. When he is well, he is neither delusional nor making poor judgment calls like taking his mother's car and bank cards and driving hundreds of miles while in a delusional state to find a fictional family. According to Desai, D.O. lost 70 pounds in a three-month period because his bipolar disorder led him to not eat or sleep properly. There is simply nothing in the record to support the contention that D.O. made a rational decision to lose weight to better his health.

Because D.O. did not have insight into his need for treatment, Desai opined that he was unlikely to be able to maintain adequate nutrition without the structure and monitoring provided in a hospital setting. Desai testified that D.O.'s inability to maintain proper levels of food intake and sleep put D.O. in danger of serious physical harm. The trial court noted that even if an individual were healthy and losing weight intentionally, such a substantial and rapid weight loss can be a potential danger. The evidence was sufficient to persuade a rational fair-minded person that D.O. is gravely disabled under prong (a).

D.O. also argues the evidence does not support a finding of grave disability under prong (b). Under this alternative, the State must provide "a factual basis for concluding that an individual 'manifests severe [mental] deterioration in routine functioning.'" LaBelle, at 208. Such evidence must include recent proof of significant loss of cognitive or volitional control and reveal a factual basis for concluding the individual is not receiving or would not receive such essential care if released. Id. To justify commitment under

prong (b), the care must be shown to be essential to an individual's health or safety and should indicate the harmful consequences likely to follow if involuntary treatment is not ordered. Id.

D.O. contends there was no evidence showing he was unable to seek out medical care when he needed it. D.O. argues he was able to purchase a phone to call for help and find a hospital in Medford. But Desai testified that if D.O. was outside the hospital setting, he would not receive the essential care he needs. This opinion is supported by the evidence. D.O.'s parents testified that before the end of 2019, D.O. was able to hold a job and engaged in normal life activities. But as his mental health deteriorated, so too did his routine functioning—he stole a car to drive to California by himself to look for a family that did not exist, he made bizarre statements to his parents and hospital staff, demonstrating he was paranoid and delusional, and he began to stay up all night and not eat, leading to him losing a significant amount of weight. He expressed violent and homicidal thoughts. He could not concentrate and was not oriented to his situation, even after being under the care of Fairfax Hospital.

The evidence also demonstrates that D.O. did not understand that the essential care he actually needed was mental health treatment. According to his father, this trip was the second one he had taken, on the spur of the moment, both times ending in his arrest. He did not understand why he had been hospitalized at Fairfax, and he thought he took his mother's car to seek out medical attention for inflammatory bowel disease, rather than for his bipolar disorder. Even at Fairfax, D.O. continued to insist he had a wife and children in California, raising a serious concern that if discharged, he would once again leave his parents' home without notice. Desai testified that without hospitalization,

D.O. would continue to decompensate, not eat, not sleep, and engage in irrational behaviors such as stealing vehicles.

The evidence supports the trial court's findings of grave disability under both prong (a) and prong (b).

B.     Right to Jury Trial

D.O. argues he was unconstitutionally deprived of his right to have a jury determine whether he had a mental illness justifying involuntary commitment in violation of article I, § 21 of the Washington state constitution.  But In re Det. of S.E., 199 Wn. App. 609, 400 P.3d 1271 (2017) is dispositive of this issue.  In S.E., we held that the state constitution does not require a jury to be seated to determine the issues presented in an ITA probable cause hearing.  199 Wn. App. at 627-28.  We see no reason to revisit that ruling.

Affirmed.

Andrus, A.C.J.

WE CONCUR: